State vs. Callahan.

## No. 11,597.

### STATE OF LOUISIANA vs. JOHN T. CALLAHAN.

The circumstance of an accomplice having told the truth about irrelevant and immaterial things, which have no tendency to confirm the material facts of his testimony involving the guilt of the accused, is not admissible in evidence for the purpose of sustaining the veracity of such accomplice, notwithstanding a further basis has been laid for his impeachment.

When a criminal statute contains separate and distinct denunciations against two separate and distinct classes of offenders, in the alternative, in one continuous and unbroken sentence, such statute must receive such construction as to give effect to all of its provisions in the sense evidently intended by the Legislature in its enactment.

*McEnery, J., Concurring.*—The trial judge's statement is that the veracity of the witness had been attacked, and the testimony was admitted to sustain his veracity. If so, the only way of sustaining it was by proof affecting his character for *truth* and *veracity*, and the examination must be confined to the witness' general reputation for truth and veracity. Wh. *Crim Laws*, Sec. 814.

*Miller, J., Concurring.*—The testimony offered to corroborate proving nothing in respect to the guilt of the accused, advances in no respect the solution of the issue of guilt * * * The act of 1890 is applicable to the offence charged.

*Breaux, J., Dissenting; Nicholls, C. J., Concurring in Dissent.*—The Constitution of 1879 has applied the principle that the jury shall be the judges of the law and the facts *after the charge*, and not of questions of law arising during the trial, and necessarily decided before the case goes to the jury.

The admissibility of testimony can not be determined if the complaint is first made when the statement of a witness is reiterated. State vs. Holmes, 40 An. 170; State vs. Donelon, 45 An. 755

The principle is well settled that if evidence had been offered to show bias, improper motive, or recent fabrication on the part of a witness, previous account given at a time unsuspicious is admissible on a redirect examination. Best's Principles of Evidence, p. 633.

APPEAL from the Criminal District Court for the Parish of Orleans. *Moise, J.*

*C. H. & C. C. Luzenberg, A. D. Henriques, James C. Walker* and *Evans & Dunn* Attorneys for Defendant and Appellant:

The jury in all criminal cases shall be judges of the law and of the facts on the question of the guilt or innocence, having been charged as to the law applicable to the case by the presiding judge.    Const., Art. 168; State vs. Spencer, 45 An. 1.

To prohibit counsel arguing the law to the jury is a denial of these rights.    Cooley Const. Lim., Ed. 1868, p. 336; Hannah vs. State; Tenn. R., Vol. 11, p. 201; Lynch vs. State, 9 Ind. 541; Stout vs. State, 96 Ind. 411; Com. vs. Porter, 10 Metcalf, 263; State vs. Henry Cason, 28 An. 40.

Under the Constitution and jurisprudence of this State the trial judge is not the "official mouthpiece of the law." He instructs or advises the jury as to the law subordinately to the rights of the jury, who are the judges of the law and of the facts. State vs. Spencer, 45 An. 1. "It is the duty of the Circuit or Criminal Judge to instruct the jury as to the law of the case, and it is frequently said that in so doing he acts as a witness as to what the law is, and that, like any other witness, he may be discredited by the jury if they are well satisfied that his testimony is untrue." Brown vs. The State 6 Baxter (Tenn.) R. 425.

No person is to be affected by the words or acts of others, unless he is connected with them, either personally or by those whom he represents, or by whom he is represented. Best's Principles of Evidence, Sec. 506, p. 487.

Things done *inter alios acta* can not be evidence against an accused; a party is not to be affected by what is done behind his back. Best's Principles of Evidence, p. 489, Sec. 507, and p. 490, Sec. 508; Taylor on Evidence, Vol. 1, p. 305, Sec. 317.

Conversations tending to implicate the defendant had when he was not present should not have been received; they are irrelevant and inadmissible. Owens vs. The State, 74 Ala. 401; Tolbert vs. The State, 87 Ala. 29; State vs. Dukes *et als.*, 19 S. E. Rep. 135.

In the trial of criminal cases, when the liberty of a man is at stake, the rules touching the admissibility of evidence should be strictly and closely adhered to, and courts ought not to relax, change or utterly disregard those rules which the law has made it obligatory on them to observe. State vs. Denis, 19 An. 120; State vs. Swayze, 30 An. 1327; State vs. Grayson, 38 An. 788; State vs. Wright, 40 An. 591.

In cases of conspiracy the rule of the law is well settled that the acts and declarations of conspirators or accomplices can only be received in evidence when they are made and done during the pendency of the criminal enterprise and in furtherance of its objects. If the declarations are made subsequently, they are merely narrative of past occurrences and must be rejected. Green. on Ev., Vol. 1, Secs. 110, 111, 233; Whart. Crim. Ev. (9th Ed.), Sec. 699; Taylor on Ev., Vol. 1, p. 524, Sec. 589 (marginal Sec. 526); State vs. Jackson, 29 An. 354; State vs. Carroll, 31 An. 861; State vs. Weasel, 30 An. 919 and 920; State vs. Buchanan, 35 An. 91.

No evidence can be legally admitted over timely objection to confirm or corroborate an accomplice which does not tend to confirm his testimony upon a material point in the sense that it tends to prove the guilt of the defendant.

If any evidence is admitted to confirm or corroborate an accomplice which is not legally entitled to that effect, it is sufficient ground for a new trial. Com. vs. Bosworth, 22 Pick. (Mass.) 397; Com. vs. Holmes, 127 Mass. 424 to 445, inclusive; 1 Greenl. on Ev. (15th Ed.), Sec. 381, note; 3 Rice on Ev., 515, 512.

Entries made in the Pennsylvania Coal Company's cash book and ledger by the book-keeper of that company by and under instructions of Lyman S. Widney, the agent and manager of that company, eight days after the litigated act was ended, are not admissible over timely objections to confirm or corroborate said Lyman S. Widney, an accomplice. Same authorities; State vs. Guillory, 45 An. 33.

The failure of the defendant to testify in a criminal case shall not be construed for or against him. Act No. 29 of 1886, p. 39.

The Assistant District Attorney, in the opening argument to the jury, said: "Who has denied that the defendant has received five hundred dollars?" "The accused has not denied it. I have not heard him deny it." To which remarks timely objection was made. The allusion by the Assistant District Attorney to the accused's failure to testify is cause for reversal; and the fact that the court rebuked them and withdrew them from the consideration of the jury does not cure the vice. Brazell vs. The State, 26 S. W. Rep. 723 decided in May, 1894; Dawson vs. State, 24 S. W. Rep. 414.

The statement of the Assistant District Attorney was "in violation of law," and "the only complete remedy is to grant him a new trial." State vs. Balch, 31 Kas. 465; 4th Amer. Crim. Rep. 519, 520; Long vs. State, 56 Ind. 182; Com. vs. Scott, 123 Mass. 239; State vs. Graham, 17 S. W. Rep. 192.

Section 1 of Act No. 78 of 1890 denounces "bribery," but does not denounce "extortion in office." Sec. 868, R. S., does.

The trial judge should have charged as requested: "If it was the duty of the accused to favor and vote for said ordinance, and if he did favor and vote for it, without partiality and favor, I

charge you, as a matter of law, that he is not guilty and you must so find." To which the trial judge added:

"But I charge you further, that if he voted for it and favored it by reason of the fact that he was paid for it, he would have acted with partiality and favor," etc.

This was error, because the court makes no distinction between "bribery" and "extortion in office." And it was error because the court told the jury, in substance, that it is a "fact" that defendant was "paid for it."

"The words of a penal statute must not be extended by construction beyond what they will fairly and reasonably bear." Bish. St. Crimes, Sec. 216.

"If the court entertains a reasonable doubt concerning the meaning of the statute, this doubt will prevail in favor of the prisoner." Ib., Sec. 218.

"No case is to be brought by construction within a statute unless it is completely within its words." Ib., Sec. 220; State vs. Whitstone, 13 An. 376; State vs. Kirby, 41 An. 298.

"The court can not enlarge the statute." United States vs. Wiltberger, 5 Wheat. 105 (Marshall, Chief Justice); State vs. King, 12 An. 593.

"We can not extend criminal statutes to cases not included within the clear and obvious import of their language." State vs. Peters, 37 An. 731, 732; State vs. Backarow, 38 An. 319.

Paraphrased, Sec. 1 of Act 78 of 1890 reads thus: "Any person who shall directly or indirectly offer or give any sum of money, bribe, present or reward * * * to any officer, State, parochial or municipal, * * * or to any member or officer of the General Assembly * * * with intent to induce such officer or member of the General Assembly * * * to perform any duty of him required with partiality or favor, * * * the person giving or offering to give, * * * and the officer or member of the General Assembly so receiving * * * any money," etc.

That section of the law provides no punishment for receiving a bribe, unless the receiver be an officer or member of the General Assembly.

Municipal officers are not included.

The rule of evidence applicable to corroboration of witnesses—ordinary witnesses—is not the rule applicable to corroboration of accomplices.

Greenleaf, Wharton, Rice and Taylor give a separate rule for each class.

Says Wharton: "The corroboration requisite to validate the testimony of an alleged accomplice should be to the person of the accused. Any other corroboration would be delusive." Whart. Cr. Ev., 9th Ed., Sec. 442; 1 Green. on Ev., 15th Ed., Sec. 381; Rice on Ev. (Criminal), Vol. 3, pp. 515, 516; Watson vs. Com., 95 Pa. St. 418, 420, 424; Middleton vs. State, 52 Ga. 527; 1 Am. Cr. R. 194, 197.

---

*M. J. Cunningham*, Attorney General, *Charles A. Butler*, District Attorney, *John J. Finney*, Assistant District Attorney, and *Lionel Adams* for the State.

" The almost universal rule which obtains in the courts of the United States and in those of most of the sister States is that counsel can not be permitted to argue to a jury questions of law which have already been decided by the court." 1 Thomp. on Trials, Sec. 492; Commonwealth vs. Zimmerman, 1 Cranch C. C. (U. S.) 47; United States vs. Columbus, 5 Cranch (U. S.), 304; United States vs. Reilley, 5 Blatchford (U. S.), 204, 207; State vs. Anderson, 44 Cal. 65, 70.

" Nor have juries the power to judge the constitutionality of acts of the Legislature, and consequently counsel can have no right to argue such questions to them." 1 Thomp. on Trials, Sec. 492; Franklin vs. State, 12 Md. 236, 246, 249; Callender's Case, Whart. St. Tr. 688, 710; United States vs. Reilley, 5 Blatchford (U. S.), 204, 207.

" The interpretation of statutes, constitutional ordinances, municipal ordinances, and by-laws, and all other written laws, is for the court and not for the jury. It has been held that juries are not the judges of the law in criminal cases, in the sense which entitles them to interpret the meaning of the words employed in penal statutes, and that it is error in its charge to submit the meaning of such words to them." 1 Thomp. on Trials, Sec. 1050; Barnes vs. Mayor of Mobile, 19 Ala. 707; Fairbanks vs.

Woodhouse, 6 Cal. 433; Peoria vs. Calhoun, 29 Ill. 317; Mortis vs. Shields, 2 Met. (Ky.) 553; Carrollton vs. People, 10 Mich. 250; Heenan vs. Supervisors, 2 Minn. 330; Denver, etc., R. R. Co. vs. Olsen, 4 Col. 239; Large vs. Oris, 30 Wis. 695; Carpenter vs. People, 8 Barb. (N. Y.) 603, 610.

"The jury in all criminal cases shall be judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge." Louisiana Constitution, Art. 168.

It is not, and never has been within the province of a jury to decide what the law of a case is. Except in periods when revolutionary passions dominated men's judgments, a jury has never been supposed to have the legal right to disregard the law as pronounced by the court to them.

The true and now generally accepted rule is that the legal duty of a jury is to receive the law from the judge; and that a jury can not rightly exercise the physical power of disregarding the instructions of the court upon the law, any more than they can rightly find a verdict directly opposite to the proof of facts. State vs. Johnson, 30 An. 905; State vs. Ford, 37 An. 465; State vs. Vinson, *Ib.* 792; State vs. Matthews, 38 An. 796; State vs. Cole *et als., Ib.* 846; State vs. Tisdale, 41 An. 351; Battiste's Case, 2 Sumn. 243; Com. vs. Porter, 10 Met. (Mass.) 263; United States vs. Morris, 1 Curtis C. C. 23; Proffat on Jury Trials, Sec. 376; 2 Thomp. on Trials, Secs. 2133, 2134; Pierce vs. State, 13 N. H. 533; Robbins vs. State, 8 Ohio St. 131; Batre vs. State, 18 Ala. 119; State vs. Drawdy, 14 Rich. L. (S. C.) 87; Duffy vs. People, 26 N. Y. 588; Montgomery vs. State, 1 Ohio, 424, 437; Hamilton vs. People, 29 Mich. 173, 189; Pennsylvania vs. Bell, Add. (Pa.) 156, 160; Georgia vs. Brailford, 3 Dall. (U. S.) 1, 4, Opinion by Jay, C. J.; Washington vs. State, 63 Ala. 135; Sweeney vs. State, 35 Ark. 586; Pleasant vs. State, 13 Ark. 360.

The evil consequences which would flow if the jury could take the law in their own hands must be apparent upon the slightest reflection. Error, confusion, uncertainty and licentiousness would characterize the criminal trials, and the safety of the accused might be as much endangered as the stability of public justice. Not only would the law itself be most uncertain, from the different views which juries might take of it, but, in case of error,

29

there would be no remedy nor redress for the injured party; the court would not have the right to review the law as it had been settled by the jury. Indeed, it would be almost impracticable to ascertain what the law as settled by the jury actually was.

If the court is to have no voice in laying down the rules which are to govern criminal trials, it is obvious there can be no security whatever, either that the innocent may not be condemned or that society will have any defence against the guilty. A jury may disregard a statute the same as any other rule. A fair trial in time of excitement would be almost impossible. All the mischief of *ex post facto* laws would be done by tribunals and authorities wholly irresponsible, and there would be no method of enforcing with effect many of our most important constitutional and legal safeguards against injustice. Parties charged with crime need the protection of the laws against unjust convictions quite as often as the public needs it against groundless acquittals. Neither can be safe without having the rules of law defined and preserved, and beyound the mere discretion of any one. Proffat on Jury Trial, Sec. 876; 2 Thomp. on Trials, Sec. 2134; Montee vs. Com., 3 J. J. Marsh (Ky.), 132, 151; United States vs. Battiste, 2 Sumn. (U. S.) 240, 243; Hamilton vs. People, 29 Mich. 173, 191; Pennsylvania vs. Bell, Add. (Pa.), 156, 160.

Nor is the opinion in Spencer's case in any respect in conflict with the rule of law enunciated in these decisions. State vs. Spencer, 45 An. 1, 11, 12.

If there was error committed by the judge in interrupting counsel it was of that immaterial and harmless character which could not have prejudiced the defendant in any way, and which, under the well settled and universal rule of practice, will not warrant the setting aside of a verdict of conviction and the granting of a new trial. If the judge was correct in his interpretation of the act of 1890, and the statute did legally include municipal officers within the number of those who could be punished for corruptly receiving a bribe, then the refusal to permit counsel to argue the contrary, if erroneous, was not error which could have affected the just result in any sense or to any degree. Whart. Cr. Pr. and Pl., Sec. 793; 1 Bish. Cr. Pr., Secs. 1276, 1277; 3 Graham and Waterman on New Trials, 717, 826; 9 Am. and Eng. Ency. of Law,

755; 11 An. 480; 16 An. 384; 30 An. 1171; 35 An. 96; *Ib.* 317; 6 An. 352, 658; 35 An. 970; State vs. Walsh *et als.*, 44 An. 1136; 2 Caines, 85; 3 Gillm. 202; 2 Turn. R. 5; 9 Cow. 680; 1 Scan. 18; 1 Gillm. 475; 2 *Ib.* 185; 11 Conn. 342; 7 Greenl. R. 42; 4 Day, 42; 10 Ga. 429; 1 Brev. 109; 23 Wend. 370; 4 Leo and M. 386; 24 Ver. 242.

The term officer in that paragraph of the first section of Act 78 of 1890, which reads: " and the officer or member of the General Assembly so receiving any money, bribe, present, reward, promise, contract, obligation or security, with the intent or for the purpose or consideration aforesaid," includes and was intended to include every State, parochial and municipal officer.

Though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the Legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the Legislature has obviously used them, would comprehend. The intention of the Legislature is to be collected from the words they employ. Marshall, C. J., in United States vs. Wiltberger, 5 Wheat. (U. S.) 176.

" We admit the cardinal rule that penal statutes are to be strictly construed, and are not to be extended to cases not included within the clear and obvious import of their language; but this rule is not to be applied with such unreasonable and technical strictness as to defeat the very purpose of all rules of construction, which is to ascertain the true meaning and intent of the statute. We are not to invent doubts or magnify quibbles, but are diligently to seek the legislative intent, as expressed in the words of the statute, aided by all other rules of interpretation, and when satisfied beyond all reasonable doubt of what the intent really is, it is our duty to apply and enforce it." State vs. McCrystal, 43 An. 911.

The rule that penal laws are to be construed strictly comes attended with qualifications and other rules no less important. It is by the light that each contributes that the judgment of the court is to be made up. The object in construing penal as well as other statutes is to ascertain the legislative intent. That constitutes the law. This intent is not to be defeated by a forced and over-

strict construction.  The rule does not.exclude the application of common sense to the terms made use of in the act, in order to avoid an absurdity, which the Legislature ought not to be presumed to have intended.  The proper course in all cases is to adopt that sense of the words which best harmonizes with the context, and promotes in the fullest manner the policy and objects of the Legislature.  Hartwell's Case, 6 Wall. 395.

And this is the true rule.  State vs. McCrystal, 43 An. 911; Com. vs. Inter. Liquors, 100 Mass. 21; Sedg. Stat. and Const. Law, 282, 289; United States vs. Lucher, 134 U. S. 624; State vs. Archer, 73 Md. 44; Indianapolis vs. Heugele, 115 Ind. 581; State vs. Godfrey, 97 N. C. 507.

" Statute law is the will of the Legislature, and the object of all judicial interpretation of statutes is to determine what intention is conveyed, whether expressly or by implication, by the language used."   23 Am. and Eng. Ency. of Law, 297.

" What the legislative intent was can be derived only from the words they used, and we can not speculate beyond the reasonable import of the words; the spirit of the act must be gathered from the words of the act and not from conjectures *aliunde*."  Mr. Justice Story in Gardner vs. Collins, 2 Pet. (U. S.) 93; Brewer vs. Blougher, 14 Pet. (U. S.) 178.

" If the language is clear and admits of but one meaning, there is no room for construction.  Courts are not to tamper with the clear and unequivocal meaning of words used, although the consequences may not be such as were contemplated by the Legislature.   There can be no departure from the plain meaning of a statute on grounds of its unwisdom or of public policy.

" The duty of courts is not to make the law reasonable, but to expound it as it stands according to the sense of the real words used.   The question is, not what the Legislature meant, but what it said.   Nor will the motive of the Legislature be allowed to overcome the clear meaning of the statute.

" This rule of literal construction, however, does not go very far, for it is confined to cases where the language is susceptible of but one construction.  Language is rarely so free from ambiguity as to be incapable of being used in more than one sense, and to adhere rigidly to its literal and primary meaning in all cases would be to miss its real meaning in many."   23 Am. and Eng. Ency. of Law, 305.

" Another elementary rule is that a thing which is within the letter of the law is not within the law unless it is within the meaning of the law; and the words, if sufficiently flexible, must be construed in the sense which, if less correct grammatically, is more in harmony with that meaning." 23 Am. and Eng. Ency. of Law, 305.

" All parts of the same statute must be taken together. If one part standing by itself is obscure, it may be aided by another. Thus, a consideration of the whole act may expand or restrict the terms of a particular clause." 23 Am. and Eng. Ency. of Law, 306 *et seq.*

In Attorney General vs. Sillem, Pollock, Q. B. said : " If the comparison of one clause with the rest of the statute makes a certain proposition clear and undoubted, the act must be construed accordingly, and ought to be so construed as to make it a consistent whole. If, after all, it turns out that that can not be done, the construction that produces the greatest harmony and the least inconsistency is that which ought to prevail." 2 H. and C. 515.

" The true rule for the construction of statutes is to look to the whole and every part of the statute, and to the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law, and thus to ascertain the true meaning of the Legislature, though the meaning so ascertained conflicts with the legal sense of the words." Aldis, J., in Regaton vs. Wansboro, 30 Vt. 745.

" If, in any particular clause of an act, expressions or words are found not so extensive in their import as those used in other parts, and if, upon a view of the whole act, the real intention of the Legislature can be gathered from the larger and more extensive expressions, courts will give effect to the larger expressions, and the particular words, ordinarily used in a less extensive meaning, must be extended to effectuate the real purpose." 23 Am. and Eng. Ency. of Law, 310.

" It is a canon of interpretation that the legislative purpose and the object aimed at are to be borne in mind, and the language susceptible of more than one construction is to receive that which will bring it into harmony with such object and purpose rather

than that which will tend to defeat it." 23 Am. and Eng. Ency. of Law, 319.

In Spencer vs. State, 5 Ind. 41, Stuart, J., said: "In statutory exposition, the reason, the spirit of the law, is above the mere cavil of words."

In People vs. Lacombe, 99 N. Y. 43, it was stated: "A strict and literal interpretation is not always to be adhered to, and where the case is brought within the intention of the makers of the statute it is within the statute, although by technical construction it is not within its letter. It is the spirit and purpose of a statute which are to be regarded in its interpretation; and if these find fair expression in the statute, it should be so construed as to carry out the legislative intent, even although such construction is contrary to the literal meaning of some provisions of the statute."

And in Com. vs. Kimball, 24 Pick. (Mass.) 370, Shaw, C. J., said: "It is unquestionably a well settled rule of construction, applicable as well to penal statutes as to others, that when the words are not precise and clear, such construction will be adopted as shall appear most reasonable and best suited to accomplish the objects of the statute."

And lastly, in order to arrive at the true legislative intent in construing a doubtful statute, that construction should be adopted which is most conformable to reason and justice; the Legislature will not be presumed to have intended that which is against reason. 23 Am. and Eng. Ency. of Law, 358.

"It is also an elementary rule in the construction of statutes that the phrases and sentences are to be construed according to the rules of grammar, the presumption being that they were used by the law-makers according to their grammatical import. The rule of construction, however, must give way to the manifest intention of the Legislature, and grammatical sense and structure of the sentences will not be adhered to if inconsistent with declared purpose, or if to do so would involve inconsistency or absurdity.

"Neither bad grammar nor bad English will defeat the operation of a statute. In accordance with strict grammatical construction, qualifying words and phrases should be confined to their next antecedent, in the absence of punctuation showing a different

intent. This rule is frequently of no effect, and indeed is so often disregarded that the contrary might seem to be established; but whatever be the rule, it is subservient to the real purpose of the statute; and qualifying words and phrases may be extended to all parts of the sentence, and even to words in other sections to effectuate the legislative intention, which is the true end of all rules of construction." 23 Am. and Eng. Ency. of Law, 368, 369, 370.

Applying these rules to the construction of the first section of Act 78 of 1890, it becomes self-evident that the term "officer," in the second clause defining receivers of bribes, includes any State, parochial or municipal officer, "receiving any money, bribe, present, reward, promise, contract, obligation or security with the intent or for the purpose or cons deration" set out in the first clause of the section.

Testing the act of 1890 further by the light of the rules of construction which have been cited, there can be no question as to the intention of the Legislature to punish any officer accepting a bribe as a consideration for the performance even of a duty required of him by law or by his office.

It is not only highly unreasonable, but absolutely absurd, to hold that it was the legislative purpose to permit State, parochial and municipal officers, without let or hindrance, to fix the price and to receive compensation for the performance of their official duties, if they but took the precaution to perform these duties as in law and in justice they should.

The District Judge was eminently correct in the conclusion which he endorsed upon the bill of exceptions, that "if the accused would have voted for the ordinance without pay it would have been an impartial action. But if he charged for his vote, such action would not be impartial, but partial; hence he acted with partiality against the beneficiary or grantee of the privilege."

There can be no "extortion in office" in this State, except by a public officer whose compensation for official services has been fixed by the Constitution or by laws passed pursuant thereto. Acts of 1888, p. 59.

It is clear from the statement of what occurred, as recited in the record:

First—That the remarks of the Assistant District Attorney were not

State vs. Callahan.

intended to be regarded as referring to the fact that the defendant himself had failed to take advantage of the privilege which the law accorded him of appearing as a witness, if he had so chosen, in his own behalf.

Secondly—That the only logical corrective method was that employed by the court to right the injury complained of, and that the indiscretion imputed to the Assistant District Attorney could not have resulted in any such wrong to the accused as would justify the setting aside of the verdict and the granting of a new trial.

In this State there is no legislative attempt, by silence, to conceal from the jury, if possible, that the law allows a prisoner to take the witness stand on his own behalf at his own election; but on the contrary by an express provision of law they are required to be furnished with this information by the court.

It is the duty of the presiding judge, either of his own motion or upon the request of the opposing party or his counsel, to interpose and check the party or his counsel in an improper and prejudicial line of argument.

"If appealed to, it becomes the imperative duty of the court to interfere in some way, either by stopping counsel or correcting the abuse in the court's instructions; since, if this is not done, the jury, in effect, are given to understand that the court is of opinion that they are allowed to take into consideration the erroneous or prejudicial statement thus made. On the other hand, unless the trial judge, on being thus appealed to, fails or refuses to interfere and to administer the proper rebuke or correction, no ground is offered for a new trial. The granting of a new trial for such a cause will be within the limits of the discretion of the trial court." 1 Thomp. on Trials, Secs. 958, 960.

Before the Supreme Judicial Court of Massachusetts, the very point at issue was presented for adjudication, and there the rule was held to be that if any objectionable comments are made by the State's counsel, upon the failure of the accused to take the witness stand in his own behalf, his remedy is to object to them at the time, and to ask the judge to instruct the jury that they should not be considered by them to his prejudice; that in such a case the judge is not required to treat the whole case as a nullity because of such remarks and to withdraw the case from the jury. Com. vs. Worcester, 144 Mass. 58, 61.

"In the present case, notwithstanding the disclaimer of the prosecuting officer that he had meant no personal allusion to the defendant, the court immediately instructed the jury that the remarks made by the Assistant District Attorney ought not to be considered by them. And besides the caution thus given, they were further instructed in the general charge that they were not to construe anything unfavorable to the accused by reason of the fact that he had failed to testify."

In this State, it has on more than one occasion been held that the Supreme Court has no power and will never attempt to interfere with district judges in the manner of controlling their courts or enforcing rules of decorum or propriety therein. Hence, the appellate court will not entertain the complaint, even where the judge has absolutely refused to stop an attorney in the course of his argument on the ground that the argument was unfair, improper or unbecoming. State vs. Duck, 35 An. 764; State vs. Christian, 30 An. 369; see also State vs. Spencer, 45 An. 1; State vs. Mack, *Ib.* 1155, 1156.

The evidence objected to should have been received—

First—Because the judge certifies in his endorsement on the bill of exceptions that the testimony objected to had already been given by the witness and had gone to the jury without objection. This brings the case within the rule laid down by the Supreme Court of this State, that "the testimony having been delivered in the presence and hearing of the jury, it has gone beyond the reach or power of the court to recall it, and it is the undeniable province of the jury to consider it in making up their verdict." State vs. Donelon *et als.*, 45 An. 755; State vs. Holmes, 40 An. 170.

Second—Because the testimony stood in immediate causal relation to the relevant fact of the payment of the money charged to have been given as a bribe, and thus became a relative incident, the details of which were necessary to an intelligent understanding of the history of the transaction. In this sense it pertained to the *res gestæ.* Whart. Cr, Ev. Sec. 262.

As the fact of payment of the money was material and could be proven, statements accompanying and explaining that act made by or to the person doing it may be proven if they are necessary to understand it. Stephen's Dig. Law Ev., p. 39, Art. 8.

It is also a well established rule of evidence that facts necessary to be known in order to explain or introduce any fact in issue, or any fact which may be relevant, are deemed themselves to be relevant in so far as they are necessary for such purpose. Stephen's Dig. Law Ev., p. 39, Art. 9.

Third—Wood, Widney and the defendant, Callahan, were confederates in a conspiracy having for its common design the securing of favorable action upon an ordinance submitted to the council by Wood and Widney, which favorable action was to be obtained at the hands of Callahan in consideration of the payment to him by Wood and Widney of the sum of five hundred dollars as a bribe.

The testimony sought to be introduced was in the nature of a declaration made by one of the conspirators after the common enterprise was at an end, it is true, but with respect to acts, agreements and understandings done and entered into in the course of and during the prosecution of the common enterprise, and at a time when that common enterprise was not yet at an end. These are considered in law to be the acts and declarations of all, and therefore imputable to all. All are deemed to assent to, or command, what is said or done by any one in furtherance of the common object.

The principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evidence against the persons prosecuted is that by the act of conspiring together the conspirators have jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design, thus rendering whatever is done or said by any one in furtherance of that design a part of the *res gestæ*, and therefore the act of all. 3 Green. Ev , Sec. 94; Whart. Crim. Ev., Sec. 694; Best's Prin. Ev. 539, (Note C) ; State vs. Ford, 37 An. 443; State vs. Banks *et als.*, 40 An. 738; 1 Tay. Ev., Sec. 592.

But assuming that this proof fell under the ban of the elementary rule, " *res inter alios acta alteri nocere non debet*," then the error committed was in the nature of one of those immaterial and harmless errors which could not have prejudiced the defendant in any way, and which do not warrant the reviewing court in disturbing the verdict of the jury, or the judgment rendered

thereunder.   Whart. Cr. Pr., Sec. 793; 1 Bishop Cr. Pr., Secs. 1276, 1277; 3 Grah. and Wat. N. T. 717, 826; 9 Am. and Eng. Ency. Law, 755; 6 An. 652, 658; 11 An. 480; 16 An. 384; 30 An. 1171; 35 An. 96; *Ib.* 317; *Ib.* 970; State vs. Walsh *et. als.*, 44 An. 1136.

In Louisiana not only may an accused be legally convicted upon the uncorroborated testimony of the accomplice, but the trial judge can not even be required to instruct the jury to discredit his testimony, unless corroborated by unimpeached evidence. *State* vs. Russell, 33 An. 137; State vs. Banks *et als.*, 40 An. 738.

But this principle of law was in no sense involved in the ruling of the trial judge, and it is absolutely foreign to the present inquiry to determine whether the necessity of corroboration be a rule of law or of practice merely, or to decide how far such corroboration must tend to establish defendant's guilt.

The only case in which counsel for the defence recognize the existence of the right to corroborate a witness who happens to be an accomplice is as to those parts of his statement which tend to connect the defendant with the crime charged.

This is clearly erroneous, as is established by the different, distinct and manifestly legal endeavors on the part of the prosecution to support the witness Widney, whose veracity and whose motives had been impeached. This evidence was not offered with a view of corroborating the evidence of an accomplice as to some material fact, in order that the jury might be justified in convicting upon the testimony, but was offered for the purpose of supporting the witness' testimony, which had been impeached by the opposing counsel, who imputed improper motives to him and a recent fabrication of his account of the transaction; and this, by showing prior similar statements made by the witness before such bias or motive could have influenced his conduct.

Adopting the language of the trial judge: "The evidence was admitted at that time before the prosecution had closed, in order to protect the State in case the accused should submit his case without offering any evidence, after having assailed the veracity of the State's only witness to the most essential and material fact of the case."

At the time that the objections were being pressed against the admission of the proof complained of, a statement of the then

condition of the case and the attitude of the defence with respect to the witness Widney was made by counsel on behalf of the State, which was acquiesced in by counsel representing the defendant. This statement appears in the record, as follows: "The avowed purpose of the cross-examination of the witness having been to impeach his credibility, to show that his statement with reference to the receipt of a bribe by the defendant, Callahan, was a fabrication of recent date; by the cross-examination of the witness as to certain occupations in which he was engaged elsewhere, outside of the city of New Orleans, for the purpose of impeaching his good standing; and as the avowed purpose of the interrogatory with reference to the 16th of November last, as to a conversation on Gravier, between Carondelet and St. Charles streets, was for the purpose of laying the foundation to contradict the witness on the stand by proof, that he had elsewhere at another time made statements contradictory to the statement made by him under oath; in other words, to show, by his conversation with the defendant, Callahan, on the 16th of November that it was impossible that he could have paid a bribe to Callahan, the defendant, at any date preceding that day.

"It is competent for the State, at this time, to corroborate the evidence of the witness by proof of such statements and facts as existed; in other words, the purpose of the defence is to shake the statements of the witness of what occurred on the 16th of November. It is competent to show by the facts and statements of the witness that things which he claims in his testimony existed did exist before the 16th of November."

In the reasons assigned by the court for admitting this proof, the judge certifies as follows:

"On the cross-examination there was very strong effort made to weaken the testimony of the witness by the most searching interrogatories. The examiner announced in open court in the presence of the jury that the defendant intended to prove that Callahan was not present at Widney's office as testified to by the latter. In other words, to prove an *alibi*. This announcement questions the truth of every fact sworn to by the witness in relation to Callahan's visit to his office. He also laid the foundation for impeaching the testimony of the witness by propounding

the necessary questions and summoning a witness for the purpose of contradiction.

" He is, therefore, to be impeached and contradicted as to material facts in the case, and particularly as to what had taken place at his office at the time he paid Callahan and under the circumstances stated. If this testimony in support of the witness Widney was not admitted, the State would be left in a crippled condition without any opportunity of repairing it, should the case be submitted. This was the ground of the ruling in the case of State vs. Fruge, 44 An. 165.

"An attack having been made upon the veracity of the prosecuting witness, it is competent for the State to sustain his statements by every corroborating fact coincident with the history of the cases testified to by him. It makes no difference whether or not such confirmation have a direct or indirect tendency to implicate the prisoner in the commission of the crime, it is relevant in order to sustain his truth, which has been called in question; to corroborate his narrative of the facts, which it has been sought to break down. I think this case, in principle, strictly parallel with that of Commonwealth vs. Wilson, 1 Gray, 138; State vs. Boyd, 38 An. 374; 1 Green. Ev., Sec. 469. I think it has been distinctly developed by the defence that fraud is to be attributed to Widney, and that he never paid the sum charged to the prisoner at the bar. If fraud or improper conduct be imputed to the witness, the supporting evidence will be admitted. 1 Green. on Ev. (15th Ed.), pp. 621, 622 (Note C), citing Annesley vs. Anglesea, 17 How. St. Tr. 1348.

" For these reasons I rule the evidnce admissible."

" A witness may be impeached either simply by questions put to him on cross-examination or by calling other witnesses to impeach his credit." Starkie on Ev. (9th Am. Ed.) 209; Roscoe Cr. Ev. 180, 181; State vs. Fruge, 44 An. 165.

" Where the character of a witness is impeached by general evidence, the party who calls him is at liberty to examine the witnesses as to the grounds of their belief; and in all cases where the credit of a witness has been attacked, whether by general evidence or by particular questions put upon cross-examination, it seems that the party who called him is at liberty to support his testimony by general evidence of good character." Starkie on Ev.

(9th Am. Ed.) 224; Whart. Cr. Ev., Sec. 491; 2 Taylor on Ev.,
Sec. 1476; Best's Pr. Ev. 633 (note); State vs. Boyd, 38 An.
374; State vs. Fruge, 44 An. 165; P yne vs. Tilden, 20 Ver. 554;
Hadjo vs. Gooden, 13 Ala. 718; Isler vs. Dewey, 71 N. C. 14;
Wertz vs. May, 21 Pa. St. 274; Sweet vs. Sherman, 21 Ver. 23;
1 Green. on Ev., Sec. 469; People vs. Ahfat, 48 Cal. 61; Com.
vs. Ingraham, 7 Gray, 46.

Apart from this category of cases, however, there is another class,
where the impeached witness is not sustained by general evi-
dence of his good character for truth and veracity, but is cor-
roborated and supported by proof that at a time not suspicious
he made prior similar statements to the one the truthfulness of
which has been assailed.

This is done under sanction of the universally accepted doctrine of
the law that where evidence has been offered tending to show
bias, improper motive, or recent fabrication on the part of a
witness, calculated to account for the testimony given, on redi-
rect examination or in rebuttal, proof of prior similar statements,
made before such bias or motive could have actuated the wit-
ness, will be received. Best's Prin. Ev. 633, note under sub-
head "Corroborating Statements;" 48 Cal. 85; Thomp. vs.
State, 38 Ind. 39; Robb vs. Hackley, 23 Wend. 50; Hayes vs.
Cheatham, 6 Lea (Tenn.), 1, 10; Stelp. vs. Blair, 68 Ill. 241;
see also Henderson vs. Jones, 10 S. and R. 322; State vs. George,
8 Ired. (N. C.) L. 324; Dossett vs. Miller, 3 Sneed, 73.

"Where the testimony is charged to have been given under the in-
fluence of some improper motive, or to be a recent fabrication—
i. e., where the counsel on the other side imputed to the witness
a design to misrepresent from some motive or relationship, then,
in order to repel such imputation, it is proper to show that the
witness made a similar statement at a time when the supposed
motive did not exist, and the fact of such statement could not
be foreseen, or when motives of interest would have prompted
him to make a different statement of the facts." Rapalje Cr.
Pro., Sec. 316; 2 Phil. Ev. 523 (10th Ed.).

" Under special circumstances, as when the witness is charged with
giving his testimony under the influence of some motive prompt-
ing him to make a forced or colored statement, it may be shown
that he made similar declarations at a time when the imputed

motive did not exist. So, in contradiction of evidence tending to show that the account of the transaction given by the witness is a fabrication of latter date, it may be shown that the same account was given by him before its ultimate effect and operation, arising from a change of circumstance, could have been foreseen." 1 Roscoe Cr. Ev. 164 (note) ; Robb vs. Hackley, 23 Wend. 50; 48 Cal. 85; Hotchkiss vs. Germania, 5 Hun. (N. Y.) 90.

In Com. vs. Wilson, 1 Gray, 340, in re-examination, with a view of strengthening his testimony, a witness having been allowed to say that he communicated to third persons, at prior times, the same or similar facts, Shaw, C. J., said: "But the rule excluding such testimony is confined to the examination in chief, and it does not apply to a case where the other party has sought to impeach the witness on cross-examination. The purpose of the cross-examination in this particular having been to impeach the witness, the question may be put." See also Boston & Worc. R. R., 1 Gray, 83, 103.

" Where the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, it is proper that such evidence should be rebutted." Whart. Cr. Ev., Sec. 492; 2 Taylor on Ev., Sec. 1330; 1 Starkie on Ev. 253; 3 Russ. Cr. 293; 2 Phil. Ev., Sec. 445; 1 Green. Ev., Sec. 469; Best's Pr. Ev. 633; Rap. Cr. Pro. 444; Henderson vs. Jones, 10 S. and R. 410; Cooke vs. Curtis, H. and J. 86; Stelp vs. Blair, 68 Ill. 543; Coffin vs. Anderson, 4 Blackf. 395; Daily vs. State, 28 Ind. 285; Clark vs. Band, 20 Ind. 555; State vs. Vincent, 24 Iowa, 570; State vs. George, 8 Ired. 324; State vs. Dove, 10 Ired. 469; March vs. Harrell, 1 Jones, 329; Lyles vs. Lyles, 1 Hill, Ch. (S. C.) 76; 48 Cal. 85; State vs. Thomas, 3 Strobh. 269; Com. vs. Jenkins, 10 Gray, 465; State vs. Hendricks, 32 Kas. 559; Hester vs. Com. 85 Pa. St. 139; Stewart vs. People, 23 Mich. 63.

With the doctrine as thus laid down our Supreme Court is in full accord, having in terms approved and adopted the rule of practice as laid down by Mr. Best in his work on Principles of Evidence at page 633, and by Mr. Rapalje in his book on Criminal Procedure at page 444. State vs. Cady, 46 An. 1346.

*Same counsel* on Application for a Rehearing:

The decisions relied on in support of the decree already rendered in the cause were pronounced in jurisdictions where the condition of the law is radically different from that which exists here with respect to accomplices in the statutory crime of bribery.

In Pennsylvania, New York and Georgia, for instance, it is provided by statute that the uncorroborated evidence of an accomplice shall not sustain a conviction. Whart. Cr. Ev., Sec. 441, pp. 378, 379, and the statutes and authorities there cited.

In Massachusetts, while it was declared that as a strict matter of law a jury might convict upon the uncorroborated testimony of an accomplice, since he is a competent witness, yet the courts there have unbendingly held that the usual practice was to advise the jury to acquit, and that this rule of practice, because of its uniformity, had acquired the force of a rule of law. In Massachusetts, therefore, notwithstanding the absence of any express statutory provision to that effect, there can be no conviction where the statements of the accomplice are unconfirmed. Whart. Cr. Ev., Sec. 441, p. 379 (Note 1); Green. on Ev., Sec. 381 (Note 2); Com. vs. Scott, 123 Mass. 222; Com. vs. Bosworth, 22 Pick. 397; Com. vs. Brooks, 9 Gray, 299; Com. vs. Price, 10 Gray, 472; Com. vs. O'Brien, 12 Allen, 163; Com. vs. Larrabee, 99 Mass. 413; Com. vs. Elliott, 110 Mass. 104; Com. vs. Snow, 111 Mass. 411.

The Massachusetts view is based upon the opinions of Phillips, Starkie and Roscoe, and rests upon the adjudications of the English judges.

So, in California and Missouri the English practice and the reasoning of the English courts have been approved and adopted.

In England the court will consider not only whether the prisoners can be convicted without the evidence of the accomplice, but also whether they can be convicted with his evidence. If, therefore, either there be sufficient evidence to convict without his testimony, or no reasonable probability of a conviction even with his evidence, the court will refuse to admit him as a witness. 1 Rosc. Cr. Ev. (8th Ed.) 198, 199; 3 Russ. on Cr. (9th Ed.) 599.

At the trial, accordingly, the English practice is to require that the accomplice be corroborated. "As the law now stands," says

Mr. Roscoe, "it is universally agreed by all the authorities that, if the accomplice were uncorroborated, a judge would be wrong who did not advise the jury not to convict." 1 Rosc. Cr. Ev. (8th Ed.) 202.

Referring to the practice of requiring some confirmation of an accomplice's evidence, Mr. Russell observes "that the practice in question has obtained so much sanction from legal authority that it 'deserves all the reverence of law,' and a deviation from it, in any particular case, would be justly considered of questionable propriety." 3 Russ. Cr. (9th Ed.) 599, 600; Lord Abinger, C. B., in Reg. vs. Farler, 8 C. and P. 106 (34 E. C. L. R.).

Mr. Greenleaf declares (1 Green. Ev., Sec. 380) that it is now so generally the practice to advise juries not to convict without the corroboration of the accomplice "that its omission would be regarded as an omission of duty on the part of the judge."

And Mr. Best in his work on the "Principles of Evidence" affirms that "it is a rule of general and usual practice—now so generally followed as almost to have the force of law—for the judge to advise the jury not to convict on the evidence of an accomplice alone." P. 171, Chamberlayne's Notes.

At common law therefore two facts are glaringly apparent:

First—There can be, in the practice, no hearing of an accomplice where there is not confirmatory evidence available.

Second—And there can be no conviction on the uncorroborated testimony of the accomplice.

It may be pertinently added that the evidence of an accomplice in these jurisdictions is merely matter for judicial comment. Best's Prin. Ev. p. 70 (Note b) ; 23 Gratt, 409; 40 Mo. 52; 24 Iowa, 441; 19 Ohio St. 55; 98 Ill. 584.

Upon what reasoning is the credit of an accomplice, in common law jurisdictions, considered so seriously affected as to require corrobation?

It can not properly be ranged upon the ground of infamy of character, for objections of that nature could only be supported by proof of conviction for an offence, and judgment of the court thereon. The true ground of objection to the evidence of accomplices arises from the obvious interest which they have, to save themselves from punishment by the conviction of the

30

accused against whom they appear.    Best's Prin. Ev. (Chamber-layne's notes) 169; 1 Green. Ev., Sec. 379.

The condition of affairs here in Louisiana is so radically different that the very grounds upon which the corroboration is required at common law make it unnecessary and unreasonable to require confirmation of an accomplice in a prosecution for bribery.

*(a)* Here, by a constitutional provision, juries in criminal cases are made the absolute judges of the facts in passing on the question of the defendant's guilt or innocence.    Art. 168.

*(b)* By express statutory provision judges in criminal trials are pre-cluded from commenting upon the evidence of the accomplice. Revised Statutes, Sec. 991.

*(c)* Not only may an accused, in this State, be legally convicted upon the uncorroborated testimony of the accomplice, but here the trial judge can not even be required to instruct the jury to discredit his testimony unless corroborated by unimpeached evidence.    State vs. Russell, 33 An. 137; State vs. Banks *et als.*, 40 An. 738.

*(d)* To require corroboration is not, with us, either a rule of law or practice, and the judge can not, properly, influence the jury in passing upon the credibility of the witness by suggesting the necessity of corroboration.    Revised Statutes, Sec. 991; 40 An. 738.

*(e)* The *particeps criminis* in cases of bribery occupies a special and anomalous position in the eyes of the law.    By the terms of Art. 174 of the Constitution he is made the sole exception provided against in Art. 6 of the organic law.    He alone of all accomplices can be compelled to criminate himself, and he alone is by ex-press provisions of law accorded immunity.    Constitution, Art. 174; Act 59 of 1878, Sec. 8.

*(f)* In prosecutions for bribery, the accomplice has no motive of in-terest that can affect him.    He is bound to confess his own crime and has no object in imputing to the defendant an offence not committed, since his statement could not be self-serving.    The bribe-giver is equally guilty whoever the receiver; the receiver's responsibility can not shift because of the identity of the bribe-giver.    In these cases the only ground of objection that can be urged against the credibility of an accomplice can not possibly exist.

State vs Callahan.

The bribe-giver and the bribe-receiver, even in the same transaction, while both guilty of bribery, are so by distinct acts and intents and have committed separate offences.

They can not be joined in the same count of the indictment, because they are not aiders and abettors in the same crime.

They are both principals in distinct and separable crimes.    The bribe-giver can not be either principal or accessory to the offence committed by the bribe-receiver.

In law they are not accomplices, because they are not co-actors in the same crime, and there is neither a principal offender nor a common criminal intent.    Whart. Crim. Ev., Sec. 440.

As between bribe-giver and bribe-taker the criminality of the one is not dependent upon that of the other.    For convenience sake these two distinct criminal acts, having their promptings in different conditions of mind and constituting separate offences, are grouped under the common designation of " bribery."

If Widney was not an accomplice the testimony objected to, under the peculiar circumstances of the case, was properly admitted.    See authorities cited in the original brief.

In prosecutions for bribery, as in rape, and for the reason that the principal fact in each case is known only to two persons, it is proper to admit the statements made by the witness about the affair at and soon after the transaction, to corroborate his evidence when questioned.

This is in accord with the public policy of the State, as manifested by Sec. 8 of Act 59 of 1878 and Art. 174 of the Constitution, which were enacted on account of the difficulty in securing convictions in bribery cases.

Until Elmer E. Wood ratified the payment of the bribe he could not be an accomplice, and was guilty of no offence against the provisions of the Act 78 of 1890. The books were, therefore, material and relevant to fix the status of Wood and his relations to the case.

Couldn't the books be used to establish the guilt of Widney, and for the same reason were they not admissible against Callahan, assuming that the two were accomplices?

Didn't the litigated act, if these men were accomplices, extend to the time of the guilty participation of Wood in the bribe-giving by the ratification of the act of his agent, Widney, in paying the money to Callahan?    Is not this obviously of the *res gestæ?*

The *counsel* for Appellant, in reply and against the motion:

Under the Constitution and laws of our State, an accomplice in bribery cases stands upon the same ground as accomplices in other felonies, except that he may be compelled to testify, etc.

In a prosecution for receiving a bribe, the Constitution makes the accomplice, who is the bribe-giver, a compulsory witness. It does not pretend to whitewash him, or invest him with either respectability or credibility.

The defect in the evidence of an accomplice is not in its quantity, but in its quality. Joy on Accomplices, p. 9.

*Res gestæ* consists of two parts, the accompanying acts and declarations attending them. The cries of the bystanders while the thing is being done are original and not hearsay evidence, because they are part of the *res gestæ*, but a party may not manufacture evidence for himself, either before or after the thing is done.

"What is said or done by participants, under the immediate spur of a transaction, becomes thus part of the transaction, because it is the transaction that thus speaks. Whart. Crim. Ev. (9th Ed.) Secs. 262 to 270; Rice on Crim. Ev. 126; State vs. Carlton, 48 Vt. 642; State vs. Estoup, 39 An. 220; State vs. Moore, 38 An. 67.

They must be without a suspicion of afterthought or forethought. Hall vs. State, 48 Ga. 608; Whart. Crim. Ev., Sec. 263.

They must be the necessary incidents of the litigated act. Whart. Crim. Ev., Sec. 263.

The litigated act, in the present case, is the act of receiving five hundred dollars with corrupt intent, etc.

"If the declaration depend entirely for its effect upon the credit of the person making it, it is inadmissible." Rapalje Crim. Pro., Sec. 243.

The entries in the cash book and ledger were made under the order of Mr. Widney, and must be considered as his own entries. They depend entirely upon his credit.

Such entries, when admissible at all, are admissible only where they were "evidently contemporaneous with the fact." 1 Green. Ev., Sec. 118, 15th Ed. (See Secs. 116, 117, 120 and notes); Taylor L. of Ev., Secs. 704, 708, 709, 710.

The opinion of the court was delivered by

WATKINS, J. The defendant was convicted of the crime of having received a bribe within the meaning of the bribery statute of 1890, and prosecutes this appeal from a sentence to five years' imprisonment at hard labor in the State penitentiary.

The charge of the indictment is that the defendant, being a member of the Common Council of the city of New Orleans, and, as such, a municipal officer thereof, on the 7th of November, 1893, feloniously did receive from one Lyman S. Widney the sum of five hundred dollars as a bribe, present or reward, for the purpose of influencing him, as such officer, to vote and exercise the power in him vested, and to perform a duty of him required with partiality and favor.

During the progress of the trial quite a number of bills of exception were taken on the part of the defendant, to various rulings of the trial judge, and to which we will give our attention in the order of their occurrence and importance.

The first question in importance, and to which the counsel on either side have devoted their arguments chiefly, is that which relates to the admission in evidence of the check and stub of the check in the check book, and the entries made by the book-keeper in the cash book of the Pennsylvania Coal Company, of which Lyman S. Widney was agent.

This question became, in due course of proceedings, the subject of three bills of exception, which are numbered in the transcript, respectively, five (5), six (6) and seven (7); all of which are, by the State's counsel, cumulated and argued in their brief, collectively.

L. S. Widney being on the stand at the instance of the State, and on cross-examination by the defendant's counsel, the basis having been laid for his impeachment, counsel for the State handed to him the aforesaid check book, and asked him if the item exhibited to him was the stub entry for the check of five hundred dollars mentioned in his testimony, as having been drawn for the purpose of getting the money that was paid to the defendant. To this, counsel for the defendant objected, because the offer was of a stub of a check book kept by Widney himself, and of which the defendant had no knowledge, and was not a party thereto; and further, because this was not the proper subject matter for re-examination.

This objection having been overruled by the court, and the testimony admitted, the defendant retained the bill of exceptions No. 5.

The ruling of the court on this question was as follows, viz. :

" I regarded the check and stub as part of the *res gestæ*. I make a distinction, in this respect, between the check and stub and the entries in the books, as eight days had elapsed from the drawing of the check up to the entry in his books, which was made November 15," etc.

On the further re-examination of Widney, counsel for the State asked him if he did not direct an entry of the payment of five hundred dollars on the books of the coal company on the 15th of November; and to that question, and the answer proposed, defendant objected that any entry that Widney would make, or cause to be made, on his books was his own act.

To this objection counsel for the State replied, that inasmuch as defendant's counsel had laid a basis for the contradiction of Widney, it was *then* competent for the State to corroborate him.

The objection having been overruled and the trial judge having admitted the testimony, the defendant's counsel retained the bill of exceptions No. 6.

As the ruling of the court is the same on bill of exceptions No. 7, reference to it will be for the present deferred.

Thereupon, counsel for the State offered the entry in the cash book of the coal company in evidence; that is to say, the entry of the 15th of November, 1893, which was referred to by Widney, as having been made under his instructions, viz.: " Check marked in red ink 93, dated November 15.   B. D. Wood & Sons, City Council two hundred and fifty dollars, immprovements two hundred and fifty dollars."

In the course of the interrogation that followed it was disclosed that the writing of the stub of the check was in the hand of Widney, and the entry in the cash book was in the handwriting of the book-keeper of the coal company, as well as the red marks on the stub.

William Cruzat, book-keeper of the coal company, was called as a witness for the State, and was interrogated with the view and for the purpose of corroborating Widney; and, in the course of his interrogation, answered that the entries in the cash book were made by him under the directions of Widney, as agent of the coal company.   Thereupon, counsel for the State offered in evidence the cash book and ledger of the coal company, and the aforesaid entries therein of date November 15, 1893, to which the defendant objected

because the entries were made therein out of defendant's presence and without his knowledge; and further, because Widney could not be corroborated by his own books and by entries made in them in pursuance of his instructions and without the presence or knowledge of the defendant.

These objections having been overruled and the testimony submitted, defendant's counsel retained the bill of exceptions No. 7.

Thereupon counsel for the State proceeded to examine the witness, Cruzat, with reference to said entries, etc.

From the testimony of Widney, as well as from the check, stub and check book, it appears that five hundred dollars were withdrawn from bank on the 7th of November, 1893—the date laid in the indictment—and paid to the defendant on that date; and that the payment closed the transaction, in so far as the defendant was concerned, and in so far as the commission of the crime of bribery is concerned.

And, from the testimony of Cruzat, the book-keeper of the coal company, as well as from the entries in the cash book and ledger, it appears that he never dealt with the check at all, nor with the stub in the check book, otherwise than as directed by Widney. It further appears that Cruzat was, at the time the check was drawn and the money paid to the defendant by Widney, directed *not to make any entry thereof* in the books of the coal company at all, but to wait a few days; and that on the 15th of November, 1893—eight days after the payment was made to the defendant, and the transaction closed—he was, by Widney, further directed to make the entry as it occurs on the cash book, and that he made same according to his directions.

Inasmuch as the reasons of the trial judge for overruling the defendant's objections to the foregoing testimony, and those appended to the aforesaid last two bills of exception, are very succinctly stated we will incorporate them in their entirety, and take the liberty of extracting same from the brief of counsel for the State.

They are as follows, namely:

"And be it further remembered that the foregoing evidence and the testimony of the witness, Lyman S. Widney, a witness for the State, with the objections and exceptions reserved to the ruling of the court, are herein set forth with particularity, and are taken from the stenographer's notes kept and taken at the time said evidence was given by the said witness.

"And now the defendant, by his said counsel, tenders this their bill of exceptions for signature, and pray that the same be filed and made part of the record."

*Per Curiam:* "I make part of this bill the written reasons on file for admitting the evidence, the statements of facts contained there-in, the testimony of L. S. Widney and Wm. Cruzat, check-book stub No. 512 of November 7, check No. 512 for five hundred dollars by the Pennsylvania Coal Company on the Louisiana National Bank and the entries in the books of the Pennsylvania Coal Company, to which objections have been made and which are the subjects of this bill.

"The entries were not offered for the purpose of corroborating the testimony of an accomplice as to those facts which fix the guilt of an accused by identifying and connecting him with the commission of the crime, but for the purpose of confirming the witness' narrative of facts, as far as possible, in all of its parts in order to sustain his veracity, which had been assailed in the manner stated in the written reasons filed at the time, and referred to above as made part hereof.

"The evidence was admitted at that time before the prosecution closed, in order to protect the State in case the accused should submit his case without offering any evidence, after having assailed the veracity of the State's *only* witness to the most material and essential fact of the case. In such a contingency should the cause go to the jury on the uncorroborated testimony of an accomplice, and the veracity of this witness had been attacked in such a way as to suggest a slight yet reasonable possibility that his statements may be untrue, this might create such a doubt in the minds of the jury as would prevent them from basing a verdict upon such testimony and the cause of the State would be irretrievably crippled. As a matter of fact such a contingency did arise, as the defence submitted their case without offering any evidence whatever on the merits.

"Before admitting the entries they were examined and found to contain no recital which had even the semblance of a tendency to identify or connect the accused, Callahan, with the receipt of the money. They did tend to confirm Widney's statements as to the following facts:

"First, as to the statement that he withdraw the sum of five hundred dollars from the business of the Pennsylvania Coal Company.

See his answers to questions Nos. 351, 352, 370, 371, 372, 374, 375, 450 and 471. They did not confirm him as to what he did with the money after it was withdrawn.

" Second, as to Wood's interest in the transfer of the privilege and his agreement to pay one-half. See answers to questions Nos. 48, 52, 54, 82, 83, 84, 85, 86, 619, 620, 621.

" Third, that this agreement was carried out; that Mr. Widney advanced the money and Wood was to return one-half, and it was so charged. See questions and answers 63, 64, 65, 351, 352, 364 to 375 inclusive, 499, 461 to 471 inclusive, 499, 82, 83, 85, 86, 619, 620, 621. It did not confirm him as to the manner of payment, nor the identity of the recipient, but merely as to the fact of payment and Wood's responsibility for one-half.

" Fourth, as to all these statements and conclusions, from which were that Wood was his accomplice. See questions and answers Nos. 15, 29, 35 to 56 inclusive; 328 to 333 inclusive, and 503.

" Fifth, as to the fact that an entry on the book had been made of the transaction; that is, that the five hundred dollars had been accounted for. See questions and answers 86 to 94 inclusive, 588, 590, 591; that the entries were made November 15, as sworn to by him in answer to question 588; that they were made under his instructions to Mr. Cruzat, his book-keeper, as sworn to in answers 588, 590 and 591. See also Cruzat's testimony, Nos. 87½ to 93, inclusive.

" Sixth, as to the fact that he was manager of the Pennsylvania Coal Company, since he had the power to draw funds from their business and to direct the book-keeper what entries to make in relation to them, and under no obligation to reveal the facts and details of the transaction. See answers 2, 3, 5, 87½ to 93 inclusive, 146, 147, 149 150, 588, 590, 591, 424. See also Cruzat's testimony, questions and and answers 7 to 16 inclusive, 38, 39, 42, 45, 46, 47; see also Judge Walker's statement (of counsel for defendant) in Cruzat's testimony that all entries were made under instructions and directions of Mr. Widney.

" Seventh, they tended to confirm his sworn statements as to concealment of the transaction—concealing the details from every one, even his book-keeper. See questions and answers 407 to 430 inclusive, 622 to 628 inclusive. See also Cruzat's testimony, 7 to 16 inclusive.

" In conclusion I regarded those entries in the nature of statements

—written statements made out of court at a time unsuspicious, in due course of business and admissible to show that they involve a condition of things conforming to the witness' sworn testimony at the trial.

(Signed)          "JAMES C. MOISE, <em>Judge.</em>"

With regard to the admissibility of the *check* and the *stub* as constituting part of the *res gestæ*, we are of opinion that the ruling of the trial judge was undoubtedly correct. They were contemporaneous in date with the principal transaction—that is, the payment of the money to the defendant—constitute a part of it and illustrate its character. Hence they were properly admitted in evidence.

But with regard to the admissibility of the *entries* in the books of the coal company, and the parol testimony of Widney and Cruzat in respect to those entries, quite a difficult question arises, because Widney had directed those entries to be made by Cruzat in the absence and without the knowledge of the defendant eight days after the transaction was closed.

This is shown by the statement of the trial judge in his reasons for admitting the testimony, viz.: "Before admitting the entries they were examined and found to contain no recital which had even the semblance of a tendency to identify or connect the accused, Callahan, with the receipt of the money.

" They did tend to confirm Widney's statements as to the following facts," etc.

It is therefore evident that the judge did not consider these entries a part of the *res gestæ*. He did not put his ruling on that ground, for he distinctly states that the testimony was admitted "for the purpose of confirming the witness' (Widney) narrative of facts as far as possible in all its parts in order to sustain his veracity, which had been assailed *in the manner stated in the written reasons filed at the time and referred to above and made part hereof.*" (Our italics.)

He finally states that he "regarded these entries in the nature of statements—written statements made out of court, at a time unsuspicious, in the due course of business, and admissible to show that they involve a condition of things conforming to the witness' sworn testimony at the trial."

We further extract from the brief of counsel for the State "the

reasons of court for admitting books in evidence attached to bill No. 6"

They are as follows, viz.:

" REASONS OF COURT FOR ADMITTING BOOKS IN EVIDENCE, ATTACHED TO BILL NO. 6.

" On August 17, 1894, on the trial of this case, the State sought to introduce in evidence certain entries made upon the books of the witness, L. S. Widney, for the purpose, as announced, of corroborating the testimony of said witness, when such testimony had not yet been assailed. I asked counsel should not such evidence, if admissible, be properly offered in rebuttal. The suggestion involved in this question did not meet with acceptance upon the part of counsel, and he urged his offer, arguing its admissibility. It was contended that the witness was an accomplice of the prisoners and his testimony should be corroborated. It was ruled inadmissible. An accomplice being a competent witness, if credit be given his testimony it would require no confirmation from other evidence. The rule of law in this State is, a jury may convict on the uncorroborated testimony of an accomplice. State vs. Cook, 20 An. 145; State vs. Bayonne, 23 An. 78; State vs. Prudhomme, 25 An. 522; State vs. Crowley, 32 An. 782; State vs. Russell, 33 An. 138; State vs. Mason, 38 An. 476; State vs. Hamilton, 35 An. 1043.

"In Russell's case, 33 An. 136, our Supreme Court held the following charge to the jury in the Prudhomme case (25 An. 522) to be correct. 'The jury may convict on the uncorroborated testimony of an accomplice; they are the judges of his credibility, and the rule requiring the judges to charge the jury that the testimony of any accomplice needs confirmation is a rule of practice rather than a rule of law.' And they say further: ' The rule requiring corroboration is a rule not of law, but of general and useful practice, the application of which is for the discretion of the judge by whom the case is tried, and in its application much depends on the nature of the offence and the witness' complicity.'

" The rule as to the character of corroborative evidence in the case of accomplices is thus laid down by Russell on Crimes, Vol. III, p. 603, ninth edition:

" ' There is a great difference between confirmations as to the circumstances of the felony and those which apply to the individual

charged; the former only proves that the accomplice was present at the offence; the latter shows that the prisoner was connected with it. This distinction ought always to be attended to. Wilkes and Edwards were charged with stealing a lamb, and an accomplice proved the case against both the prisoners, and stated that they threw the skin of the lamb into a whirley hole, the situation of which he described, and a constable proved that he found the skin in the whirley hole. A quantity of meat was found of a kind corresponding with that of the stolen lamb in the house of Edwards, but could not be positively identified, and a witness proved that Wilkes had come to him to borrow a pair of shears, and had then made a statement to him to the same effect as the evidence of the accomplice. Alderson, J., said in summing up: "The confirmation of the accomplice as to the commission of the felony was no confirmation at all, because it would be a confirmation as much as if the accusation were against you and me, as it would be to those prisoners who are now upon their trial. The confirmation which I always require juries to require *is a confirmation of some fact which goes to fix the guilt upon the particular person charged.*" ' (Italics are the court's.)

" ' *The corroboration,*' says the same author, p. 602, ' must not only connect the prisoner and the accomplice together, but must be such as to show that the prisoner was engaged in the transaction which forms the subject matter of the charge under investigation.' And after giving the facts of the case, cited Reg. vs. Farler, MSS. C. G., 8 C. and P. 106 (34 E. C. L. R.), and quotes Lord Abbinger as follows:

" ' Now, in my opinion, that corroboration ought to consist in some circumstance that affects the identity of the party accused. A man who has been guilty of a crime himself will always be able to relate the facts of the case, and if the confirmation be only of the truth of that history without identifying the persons, that is really no corroboration at all. See the many cases cited in illustration in Russ. Cr. (9th Ed.), Vol. III, pp. 599 to 611 inclusive.

"Therefore, if such evidence is not confirmatory in its nature it is logically irrelevant, but it has never been considered sufficiently disconnected with the main issue as to warrant its exclusion on that ground.

"In the many cases cited, the evidence went to the jury subject to the charge of the court on its effect, but in every instance it was

the testimony of a third person as to the same fact testified to·by the accomplice, and not a prior statement of the accomplice, oral or written, in substantiation of his own testimony, and thus amenable to another legal objection positively justifying its exclusion.

"Viewing the case at bar in the light of these principles, *proof of the fact that an entry had been made* in the books of Mr. Widney as to the withdrawal of five hundred dollars from his business *on the date stated could not be objectionable,* but to admit in evidence the entries themselves so that their recitals would be proof against the prisoner and binding upon and identifying him as the party who received the money, when it was not shown that he was present when the entries were made, or when Mr. Widney directed his book-keeper to make them, or that he was aware that they were made, would be contrary to the elementary principles of evidence.

"It would be competent to prove the withdrawal of funds from a business, or the withdrawal or delivery of goods from a stock of merchandise, or prove any other such facts in the due course of business, by such entries, under certain conditions, but they are not admissible to fix the identity of a person under the circumstances of this case as to his complicity in the crime charged.

"There must have been some evidence as a foundation to connect Callahan with the particular entries sought to be introduced in evidence. This position appears to me to have greater force when the evidence was offered, not to prove an independent, substantive, relevant fact by a third person in corroboration of the accomplice's testimony, but to corroborate him by his prior statements in his books when his testimony has not been assailed.

"Since this ruling the witness has been cross-examined and turned over to the State for redirect examination. The prosecution again offers the books in evidence for the purpose of substantiating the witness' testimony, it having been positively attacked. It is claimed the situation has now materially changed, since a basis has been laid for the introduction of this evidence by the assault upon the witness' veracity.

"On the cross-examination there was a very strong effort made to weaken the testimony of the witness by the most searching interrogatories. The examiner announced in open court, in the presence of the jury, that the defence intended to prove that Callahan was not present at Widney's office, as testified to by the latter. In

other words, to prove an *alibi*. This announcement questions the truth of every fact sworn to by the witness in relation to Callahan's visit to his office. He also laid the foundation for impeaching the testimony of the witness by propounding the necessary questions and summoning a witness for the purpose of contradiction.

" He is, therefore, to be impeached and contradicted as to material facts in the case, and particularly as to what had taken place at his office at the time he paid Callahan, and under the circumstances stated. If this testimony in support of the witness Widney were not admitted, the State would be left in a crippled condition without an opportunity of repairing it, should the case be submitted. This was the ground for the ruling in the case of State vs. Fruge, 44 An. 165.

" An attack having been made upon the veracity of the prosecuting witness, it is competent for the State to sustain his statements by every corroborating fact coincident with the history of the case as testified to by him. It makes no difference whether or not such confirmation have a direct or indirect tendency to implicate the prisoner in the commission of the crime, it is relevant in order to sustain his truth, which has been called in question; to corroborate his narrative of the facts, which it has been sought to break down. I think this case, in principle, strictly parallel with that of Commonwealth vs. Wilson, 1 Gray, 138; State vs. Boyd, 38 An. 374; Greenleaf R. 469; Logansport & P. Grove T. Company vs. Heil, 118 Ind. 136.

" In a prosecution for rape, if the prosecutrix, having been admitted to testify that she made complaint immediately after the fact, is impeached as to the fact of this complaint, she may be supported by proving she has out of court narrated the facts as testified to by her at the trial. Thompson vs. State, 38 Ind. 39.

" I think it has been distinctly developed by the defence that fraud is to be attributed to Widney and that he never paid the sum charged to the prisoner at the bar. If fraud or improper conduct be imputed to the witness, the supporting evidence will be admitted. Greenleaf on Evidence (15 Ed.), Vol. 1, pp. 621, 622 (note C), citing Annesley vs. Anglesea, 17 How. St. Tr. 1348.

" For these reasons I rule the evidence admissible."

From the foregoing we have it affirmed by the trial judge that these entries were not offered for the purpose of corroborating the testimony of an accomplice as to those facts which fix the guilt of

an accused by identifying and connecting him with the commission of the crime. That at a prior stage of the trial and *before* a basis had been laid for Widney's contradiction, these entries had been offered on the part of the State, and rejected on the ground that to admit them as binding on the defendant, and identifying him as the party who received the money when it was not shown that he was present when the entries were made, "would be contrary to the elementary principles of evidence." That these entries were admitted over objection *after* the basis had been laid for Widney's impeachment for the purpose of corroborating his narrative of facts and to sustain his veracity. That *since* the credibility of Widney has been attacked the situation has materially changed and the entries have become competent evidence, though inadmissible *before* it was attacked; and " that it makes no difference whether or not such confirmation has a direct or indirect tendency to implicate the prisoner in the commission of the crime."

That this affirmation of the trial judge be fully enforced, we make the following extracts from the brief of counsel for the State.

"The error into which the astute counsel representing this defendant have fallen, grows out of the assumption that the only corroboration of a witness who happens to be an accomplice whica the law will permit, is a corroboration as to those parts of his statement *exclusively*, which tend to connect the defendant with the crime charged.

"Their constant announcement of the rule was, that unless the testimony offered in corroboration had the tendency to prove some fact connecting the defendant with the crime charged, or to show any participation of the defendant with the accomplice at any stage of the transaction, it should have been scrupulously excluded.

"As written in the record, the history of the case establishes that the very character of testimony which was here objected to had previously been offered on behalf of the prosecution for the avowed purpose of corroborating the accomplice, Widney, and that when thus offered it was unhesitatingly rejected by the court as inadmissible for that purpose because it did not amount to a confirmation of some fact which tended to fix upon the defendant the commission of the crime charged in the indictment.

   *    *    *    *    *

"It is therefore obvious that the District Judge was in full accord

with the defendant's counsel in holding that the confirmation of an accomplice which is required must not only connect the prisoner and the accomplice together, but must be such as to show that the prisoner was engaged in the transaction which forms the subject matter of the charge under investigation.

"The evidence, however, was offered and admitted at the trial for *an entirely different and distinct purpose*. It was not introduced with a view to corroborate the testimony of an accomplice as to some material fact in order that the jury might be justified in *convicting* upon his testimony, but was offered for the purpose of supporting those of his statements which had been *impeached* by the opposing counsel, who had imputed to him improper motives and a recent fabrication of his account of the transaction by showing prior similar statements made by him *before* such bias or motive could have influenced his declarations."

Counsel for the State then formulate the following propositions, and state their authorities thus:

" Besides these cases there are also others where the supporting testimony is permitted solely because of the nature of the peculiar circumstances which exist. In this latter class of cases the impeached witness is not sustained by *general evidence* of his good character for truth and veracity, but by proof that at a time not suspicious he made *a prior similar statement* to the one, the truthfulness of which has been assailed. Therefore it is now laid down as a maxim of the law that where evidence has been offered tending to show bias, improper motive or recent fabrication on the part of a witness calculated to account for the testimony given, then prior similar statements, made *before* such bias or motive could have actuated the witness, may be given on *redirect examination* or *in rebuttals*. Best's Prin. Ev. 633, note under subhead "Corroborating Statements;" 48 Cal. 85; Thompson vs. State, 38 Ind. 39; Robb vs. Hackley, 23 Wend. 50; Hayes vs. Cheatham, 6 Lea (Tenn.) 1, 10; Stelph vs. Blair, 68 Ill. 241. See also Henderson vs. Jones, 10 S. and R. 322; State vs. George, 8 Ired. (N. C.) L. 324; Dossett vs. Miller, 3 Sneed, 72."

From the foregoing we have the proposition that the entries in the books, made under the direction of Widney, an *accomplice*, were *inadmissible* for the purpose of corroborating his statements of fact fixing the guilt of the defendant; but that when a basis had been

laid by defendant for his impeachment, they became *admissible*, as a previous consistent statement, for the purpose of sustaining his veracity. Or, put in other words, it is that laying the basis for the *impeachment* of an *accomplice* constitutes him a *witness*, entitling him to all the privileges and immunities of a witness. That is to say, that an *accomplice* being, in contemplation of law, a person unworthy of credit, and whose testimony requires some *confirmation* to entitle same to full faith and credit, is relieved from this disability the moment a *further* direct attack upon his credibility is made; and *eo instanti* he becomes *elevated to the plane of a trustworthy and credible witness*.

It would seem that a legitimate deduction from that statement would lead to the opposite view. But, if this theory be correct, the distinction that is taken between witness and accomplice would appear to be more seeming than real.

That Widney is an accomplice of the defendant appears on the face of the indictment; and on the face of the statute under which the indictment was found. Sec. 1, Act 78 of 1890. That section of the statute is couched in same phraseology as the the 173d article of the Constitution.

The trial judge recognized and treated him as an accomplice in his rulings in this case.

*Vide* opinion and rulings above quoted.

That we be under no misapprehension with regard to the legal *status* of an accomplice who is placed upon the witness stand to testify in behalf of the State, let us look into the authorities on the subject, and see how they stand.

In Commonwealth vs. Bosworth, 22 Pickering, 397, the Massachusetts court stated the rule thus:

"But the source of this evidence is so corrupt that it is always looked upon with suspicion and jealousy, and is deemed unsafe to rely upon without confirmation."

And in treating of what confirmation is requisite the court said:

"We think the rule is that the corroborative evidence must relate to some portion of the testimony which is material to the issue. To prove that an accomplice had told the truth in relation to irrelevant and immaterial matters, which were known to everybody, would have no tendency to confirm his testimony involving the guilt of the party on trial."

31

That decision has been since adhered to and affirmed in that court in the following cases, viz.: Commonwealth vs. Larrabee, 99 Mass. 413; Commonwealth vs. Elliott, 110 Mass. 104; Commonwealth vs. Stone, 111 Mass. 411; Commonwealth vs. Scott, 123 Mass. 222; Commonwealth vs. Holmes, 127 Mass. 424.

And the same rule has been adhered to and followed in the courts of other States. *Vide* State vs. Walcott, 21 Conn. 272.

The Georgia court states the proposition thus:

"There is absolutely no evidence corroborating the accomplice, Thurman, in the sense of the law. We decided in the case of Childres vs. State, 52 Georgia, 106, that the corroborating circumstances must be such as connect the *prisoner* in some way with the *crime*. * * * That the conviction in the case at bar is based solely on the testimony of Thurman. There are circumstances going to show *he is* guilty other than what he states, but absolutely none that the *prisoners* are. * * * That (the accomplice) told the same tale when arrested is not only no corroboration by any matter connecting the *prisoners* with the crime, but it is illegal testimony any way.

"It is strange to bolster up a witness by proof that he has told the same story before. We know of no authority for such a practice." Middleton vs. State, 52 Ga. 527.

The Pennsylvania court states the rule thus:

"It is almost the universal opinion that the testimony of an accomplice should be corroborated as to the *person* of *the prisoner* against whom he speaks. Some *fact* should be proved by testimony *independent* of the accomplice, which, taken by itself, leads to the inference, not only that a crime has been committed but that the *prisoner* was implicated in it. To prove that the accomplice had told the truth in reference to irrelevant and immaterial matters * * * would have no tendency to confirm his testimony involving the guilt of the party on trial." Watson vs. Commonwealth, 95 Pa. 424.

The California court pronounced the rule thus:

"The *acts* of an accomplice are not evidence against the accused unless they constitute a part of the *res gestæ*, and occur during the pendency of the criminal enterprise, and are in furtherance of its objects." People vs. Moore, 45 Cal. 19; People vs. Stanley, 47 Cal. 113.

The Missouri court quotes with approval the rule as announced in Rex vs. Farlar, 8 Car. and P. 106, to-wit:

"It is a practice which deserves all the reverence of law, that judges have uniformly told juries that they ought not to pay any respect to the testimony of an accomplice unless the accomplice is corroborated in some material circumstance.

"Now, in my opinion, the corroboration ought to consist of some circumstance that affects the *identity* of the *accused*. A man who has been guilty of a crime, himself, will always be able to relate the facts of the case; and, if the confirmation be *only to the truth of that history*, without identifying the persons, that is really no corroboration at all." State vs. Chioyk, 92 Missouri, 395.

The foregoing extracts have been selected as pertinent to the question at issue, and as illustrative of the *consensus* of the best judicial opinion on the subject; and we also refer to the following decisions, without quoting from them, as being equally decisive and authoritative: People vs. Elliott, 5 New York, 204; Boyce vs. People, 55 New York, 645; Armstrong vs. People, 70 New York, 38; People vs. Plath, 100 New York, 593; Coleman vs. State, 44 Texas, 109; State vs. Thornton, 26 Iowa, 80; Lamkin vs. State, 68 Alabama, 56; Ross vs. State, 74 Alabama, 532.

Nor is this so *only* of the adjudications of the other States of the Union, but like principles are announced by *all* text writers, of which we cite the following, viz.: 3 Rice Criminal Evidence, Sec. 325; 1 Greenleaf (14th Ed.), Sec. 381 and note; 1 Phillips Evidence, pp. 30, 38, 112; 2 Russell on Crimes, pp. 396, 956, 967, 968; 2 Starkie Evidence, pp. 11, 12; 1 Roscoe's Criminal Evidence, pp. 120, 133, 155, 160; 1 Hale's Pleas for the Crown, p. 305; Wharton Criminal Practice (9th Ed.), Secs. 442, 481, 490.

Mr. Bishop puts the proposition thus tersely: "Nor does the testimony of one accomplice confirm another." 1 Bishop Crim. Proc., Sec. 1170.

Joy, Lord Chief Baron of the Exchequer of Ireland, says: "Besides, these circumstances were deposed to by the accomplices themselves, and it is the first time I ever heard that an accomplice can *corroborate himself* by the circumstances which he swears to." Joy's Evidence of Accomplices, 35.

Recognizing these established principles, we held in a recent case that all the decisions and authors concur in the opinion that the tes-

timony of an accomplice can not be confirmed except "by evidence from a purer source." State vs. Mason, 38 An. 476.

That decision is in strict keeping with prior and subsequent opinions of this court. State vs. Banks, 40 An. 736; State vs. Hamilton, 35 An. 1043; State vs. Russell, 33 An. 136; State vs. Prudhomme, 25 An. 532; State vs. Bayonne, 23 An. 78; State vs. Cook, 20 An. 145.

The trial judge recognized this rule of jurisprudence when he re‑ jected and disallowed in evidence the entries in the books of the coal company, on the ground that to admit them as binding on the defendant, and identifying him as the party who received the money, when it was not shown that he was present when the entries were made, "would be contrary to the elementary principles of evidence." But when a basis had been laid for a specific impeachment of Wid‑ ney's general character for truthfulness, the judge was of opinion— and so ruled—that the situation was, on that account, materially changed, and the rejected entries had become admissible evidence, "whether or not such confirmation has a direct or indirect tendency to implicate the prisoner in the commission of the crime."

Entertaining this view he permitted the entries introduced on be‑ half of the State *for the purpose of corroborating Widney's previous narration of facts and of sustaining his veracity.*

If this ruling be correct and must be sustained by this court, it is because an accomplice loses his character as such, and becomes a witness, as soon as a basis is laid for his impeachment.

To thus hold and decide would be equivalent to saying that a per‑ son who is unworthy of credit, and whose testimony needs corrobora‑ tion to entitle it to full faith and credit, is relieved from that disa‑ bility as soon as further formal assault is made upon his veracity, entitling him to the privileges and immunities of a credible and trustworthy witness.

We have been furnished with neither authority nor precedent for that proposition; nor have we been able, after most industrious ex‑ amination of adjudicated cases and text‑books, to find any precept sustaining it.

The only cases cited by the trial judge as sustaining that view are: State vs. Boyd, 38 An. 374, and Commonwealth vs. Wilson, 1 Gray, 133.

In our opinion neither of those cases have any application to the

question under consideration, as they simply state the rule applicable to ordinary witnesses and make no reference to accomplices.

In the case of State vs. Banks, 40 An. 736, there was no question of the *impeachment* of either witness or accomplice. The accomplice had testified that the defendant had told him "where *he* had *procured the axe* with which the homicide had been committed;" and another witness testified, in corroboration of that statement, that the accomplice " had *shown him the place* where the homicide had been committed and the spot where the body of the victim had been found."

The court properly held this testimony admissible for the purpose of corroborating the testimony of an accomplice; but it was admissible for the reason that it tended directly to establish the guilt of the defendant, and because it was the statement of a *third person*, disconnected with the case.

Even with reference to the admissibility of circumstantial evidence to sustain the veracity of an *ordinary witness* on the part of the State, the most recent opinion of this court is adverse to the theory entertained by the trial judge, for in State vs. Guillory, 45 An. 31, the following occurs:

" The trial judge assigns as his reasons for permitting the testimony to be introduced, *first*, that it was in corroboration of the testimony of one of the *witnesses* for the State, who had testified that he saw Ambrose Guillory hand a pistol to the accused when the quarrel began; *second*, that the testimony of said witness was the subject of an attempt, by the defence, to impeach and contradict him on that point.

"These reasons," say the court, " are in our opinion insufficient to justify the radical departure from elementary principles, in permitting hearsay testimony as a part of the affirmative evidence on the part of the prosecution. The judge's ruling was clearly erroneous, and the accused is entitled to relief."

In our opinion it is a contradiction in terms to treat of the *impeachment* of an *accomplice*, in view of the fact that being an *accomplice* attaches to his testimony such a degree of suspicion and jealousy that it is deemed unsafe for a jury to rely upon it without confirmation. The very object of impeachment is to discredit a witness; and if the statement of a witness is already discredited, by reason of his being an accomplice, it would seem to be the work of supererogation to administer additional testimony looking to his impeachment.

This principle was affirmed in the People vs. Vane, 12 Wendell, 78, in which the New York court say that " the witness stands impeached by the direct testimony given by himself, as in the present case. The witness shows on his direct examination that he was an accomplice; his testimony is therefore suspicious; it comes from a tainted source, and may well be doubted. In such case it seems to me the principle applies that a witness who has been impeached may be supported."

And Mr. Thompson in his treatise on trials, in announcing the same principle, says: " It has been reasoned that *when the witness is an accomplice this fact alone is an attack upon his credibility*," etc. 1 Thompson on Trials, Sec. 549, p. 466.

To the same effect is State vs. Twitty, 2 Hawks (N. C.), 449, and other cases in that court. And, inasmuch as testimony corroborative of the testimony of an accomplice must *tend* to establish the guilt of the accused, it would seem to be incompatible with both the reason and spirit of the rule to permit the introduction of *any other character* or *species* of testimony to sustain his general character for truthfulness, because of an effort to further impeach his credibility.

The whole question seems to be completely covered by the opinion in the Massachusetts court, in Commonwealth vs. Bosworth, 22 Pickering, 397.

In that case the testimony of an accomplice was the sole reliance of the prosecution. The District Attorney sought to *corroborate* his testimony by that of other witnesses, and this was permitted over objection of defendant's counsel.

" For the purpose of *impeaching* the testimony of the accomplice," says the report, " the defendant introduced a letter from him," the accomplice, " to the defendant, in which he admitted that his testimony in relation to this case, on a former occasion, was false * * *

" The District Attorney, in order to corroborate the testimony of the accomplice *for the purpose of supporting his general credit*, then called sheriff and jailer to prove that the situation of the rooms and the arrangement of the prisoners therein corresponded with the account given by the accomplice. To the admission of this evidence the defendant objected, but the court overruled the objection and admitted the evidence."

So that it is apparent that that case presents the identical question that confronts us in the instant case.

The court, first reciting the rule that is announced *supra*, to-wit: " that the corroborative evidence must relate to some portion of the testimony which is material to the issue," held that it was not competent " to prove that an accomplice had told the truth in relation to irrelevant and immaterial matters," etc.   And with regard to the attempted impeachment and the effort of the State to sustain his veracity, the court say further:

" We can not perceive how the circumstance that the witness told the truth about these public and common objects, concerning which he knew that proof was at hand, has *any* tendency to confirm the material parts of his testimony involving the guilt of the defendant."

That opinion is perfectly conclusive and irresistible, to the effect that the testimony of an accomplice, whose veracity has been specially impeached, can not be sustained by any species of testimony that has no tendency to confirm the material parts of his evidence involving the guilt of the defendant.

Nearly fifty years after that opinion was announced, it was again examined and affirmed by the same court in Commonwealth vs. Holmes, 127 Mass. 424, Mr. Justice Gray being the organ of the court.   The court style the Bosworth case as " the leading case in this court on the subject; " and, making a lengthy quotation therefrom, they affirm it on both propositions.   Since that time the doctrine of the *Bosworth* case has stood unquestioned, and has been cited as authoritative by all subsequent text writers.

In our opinion the principle on which the doctrine is founded is correct and fundamental, and, accepting same as correct, our conclusion is that the learned judge of the trial court improperly *permitted* the introduction in evidence of the entries in the books of the Pennsylvania Coal Company over the defendant's objection, and that thus admitting same was reversible error.

Having reached this conclusion, it becomes our duty to dispose of the defendant's motion in arrest of judgment, which, in substance, presents the same question as that which was made the subject of discussion by counsel for the defendant, and figures in one of defendant's bills of exceptions—the bill of exceptions which covers the ruling of the court on this question being No. 19.

The motion in arrest of judgment is couched in these words:

" Sixth. Because the indictment fails to charge that the defend-

ant was an officer or member of the General Assembly at the time it is charged he received the said sum of five hundred dollars."

As stating the construction of the statute most favorable to the defendant, we have selected and appended hereto the paraphrase of Sec. 1 of Act No. 78 of 1890, which is drawn in question by the motion in arrest, which is as follows, viz.:

" Any person who shall directly or indirectly offer or give any sum of money, bribe, present or reward * * * to any officer, State, parochial or municipal, * * * or to any member or officer of the General Assembly * * * with intent to induce such officer or member of the General Assembly * * * to perform any duty of him required with partiality or favor * * * the person giving or offering to give * * * and the officer or member of the General Assembly so receiving * * * any money, bribe, present or reward * * * with the intent, or for the purpose of consideration aforesaid, shall be guilty of bribery."

It is quite true that the present indictment is founded upon the *latter* denunciation of the statute, namely, " the officer or member of the General Assembly so receiving * * * any money," etc., yet it is distinctly and immediately connected with the *former* denunciation of the same section of the statute.

"The words ' so *receiving* ' evidently relate back to the words of the section first quoted with regard to the person who ' shall *give* any sum of money, bribe, present or reward,' etc.; and, examining the words that intervene, we find the enumeration of these two denunciations to be ' any officer, State, parochial or municipal, * * * or any member or officer of the General Assembly.' "

We are of opinion that the words " officer or member of the General Assembly" must be taken to refer to *all persons enumerated* in the foregoing portion of the act—that is to say, the State, parish and municipal officer, or member of the General Assembly; and this view is enforced by the fact that both denunciations are contained in one single sentence.

The motion in arrest of judgment is not good.

It is therefore ordered and decreed that the verdict of the jury and the judgment and sentence thereon based, be annulled and reversed; and it is further ordered and decreed that the cause be remanded to the lower court for a new trial according to law and the views herein expressed.

CONCURRING OPINION.

McENERY, J.  The entries made in the books of the Pennsylvania Coal Company, by the direction of the witness Widney, out of the presence of the accused, and some seven days after the commission of the crime, were not admissible evidence to prove the guilt of the accused.  The entries in the books were distinct collateral facts irrelevant to the issue.

This is admitted in the trial judge's statement.

Conceding, therefore, that the witness was not an accomplice, but a disinterested witness, under the pretence of corroborating his testimony no fact could be stated by him that was not admissible evidence against the accused.

The credit of a witness may be impeached by proof that he has made statements out of court contrary to what he has testified at the trial.  But it is only on such matters as are relevant to the issue that the witness can be contradicted.  Therefore a witness can not be examined as to any distinct collateral fact irrelevant to the issue. 1 Wharton Criminal Law, par. 817.

Proof of declarations made by a witness out of court in corroboration of testimony given by him on the trial is, as a universal rule, inadmissible, and a fortiori, a witness can not be allowed to corroborate his own testimony by saying that he made the same statements previously to others.  So, too, where it is proved that a witness has at other times made statements different from his testimony, the party offering him can not be allowed to support his testimony by proving statements at other times corroborative of such testimony.

The witness had sworn that he had paid five hundred dollars to the defendant to bribe him.  Seven days after this he caused to be made certain entries in the books of the company of which he was the agent for the purpose of bribing defendant, placing the five hundred dollars to the account of the city.  It is incomprehensible how such testimony as to this fact of the entry could be allowed in evidence to corroborate the witness' statement to the bribery of defendant by paying him cash, five hundred dollars.

If the witness had voluntarily sworn falsely to matters not within the issue he could have been contradicted as to those matters.  1 Wharton Criminal Law, par. 818.

But it is not pretended in this case that the witness in the examina-

tion in chief had voluntarily sworn to any matter not within the issue for which there was an attempt to contradict him.

The greatest latitude in impeaching a witness by proof of his having previously made statements inconsistent with his testimony has gone no further than to allow proof of other statements made by him in accordance with his testimony on the trial. 4 Blackf. 295; 6 Blackf. 300.

The witness in such a case must be first impeached, and there was no impeachment of the witness' testimony on any fact that would justify the admission of the evidence as being in accordance with his testimony on the trial.

According to the statement of the trial judge the contradiction of witness' testimony was to impeach the whole of it " by the most searching interrogatories." Hence the trial judge's statement is that the veracity of the witness had been attacked, and the testimony was admitted to sustain his veracity. If so the only way of sustaining it was by proof affecting his character for truth and veracity, and the examination must be confined to the witness' general reputation for *truth* and *veracity*. Wharton Criminal Law, par, 814.

But the whole controversy in this case is narrowed to this: Can evidence which is inadmissible against defendant to establish his guilt be permitted to go to the jury on the pretence of sustaining the testimony of a witness? The answer must be in the negative, otherwise no rule for the rejection of inadmissible evidence could be invoked to exclude it from the consideration of the jury.

The trial judge states that the entries contained no recital which had even the semblance of a tendency to identify or connect the accused with the receipt of the money.

He further states that the defendant attempted to prove an *alibi* by weakening the testimony of the witness by the most searching interrogatories, and thus question the truth of every fact sworn to by the witness.

This statement alone shows the utter irrelevancy of the testimony to the issues in the case, and the necessity for applying the rules of evidence referred to herein.

I concur in the decree for the reasons stated in this opinion.

## CONCURRING OPINION.

MILLER, J.   One proposition presented by this appeal impressed me at the time of the oral argument as of importance greater than that of any other question discussed.   The conviction was on testimony in part derived from book entries, admissible, it was claimed, to confirm a witness who had testified to the guilt of the accused. The offence, according to the testimony, had been committed on the '7th, and the entries, directed by the witness, made on the 15th November.   The entries carried no significance whatever touching the accused.   They were debits in the books of money paid for apparently legitimate purposes.   Their tendency to corroborate the witness who had criminated the accused was not readily appreciable if corroboration implies anything confirmatory of the testimony of the witness in respect to the material issue, the guilt of the party charged by the accusing witness and convicted on his testimony.   If not admissible as corroborating the witness on the issues, for which purpose only, in my appreciation, the entries were offered, then the conclusion seems inevitable, the conviction was on illegal evidence carrying the necessary result in criminal cases.   It would be, as it impressed my mind, difficult to sustain a verdict on testimony brought forward to serve one purpose for which it was not competent, but none the less contributed to obtain a verdict from the jury against the accused.   If the evidence was not admissible as corroboration in any legal sense, then the conviction had been secured on these entries not made by the accused, nor to which he was in any way a party, but by the witness, and by his direction, placed in the books seven days after the offence is stated to have been completed, and all connections of the accused with the accomplice had ceased.

It could hardly be claimed, nor is it appreciated to be urged, that these entries could be deemed part of the *res gestæ*.   Acts and conduct accompanying the particular fact under investigation are considered as illustrating its character.   Such acts and conduct arise out of the event, admit of no premeditation and carry the sanctity due to them as concomitants of the event itself.   There were, as is gathered from the bills, two interviews, perhaps more, of the accused with the witness.   The last was begun and ended on the 7th November with the bribe then, as the witness testifies, given by him to the accused.   It was seven days after the witness gave to his

book-keeper the directions under which the entries were made. It is too manifest to need the least discussion the entries formed no part of the *res gestæ*. 1 Greenleaf on Evidence, Secs. 108, 110.

The State contended for the admissibility of these entries as tending to confirm the witness. He had testified to bribing the accused on the 7th November. It is claimed and conceded in the argument that the defence had afterward assailed the character of the witness for truth by attributing to him a design to misrepresent, and had avowed the purpose to discredit him. The entries offered on the direct examination had been excluded, but with the basis claimed to have been afterwards furnished they were again offered and received over the objection of the defence. It was an attempt to sustain the statements of the accomplice as a witness by his book entries. The rule relied on by the State is, that when the character of a witness is assailed on cross-examination the party calling him may support the testimony by proof of statements by the witness on other occasions. Greenleaf thus states it: Statements by the witness similar to what he has testified in the cause are not admissible, unless a design to misrepresent is charged on the witness in consequence of his relation to the party or to the cause, in which case it seems it may be proper to show he made a similar statement before that relation existed. 1 Greenleaf, Sec. 469. The rule varied in form is again stated thus: "Prior similar statements may be given in evidence made before any improper motive could have actuated the witness; in general, however, prior consistent statements can not be admitted." Best's Principles of Evidence (Ed. 1883), 633, notes. The other text writers and a long array of adjudications state the rule substantially the same. Admissibility of such statements is the exception; prohibition is the rule. The guarded terms in which the rule is couched announce the limitations as to the time and the relations of the witness subsisting when the statement is made. These entries were made seven days after the bribe was given. It is not understood that the argument for the defence against the admissibility of the evidence is based on the specific ground of the time of the entries, but controverts its admissibility on any grounds.

The circumstances under which the State claims the admissibility of the entries are these: The witness had testified to bribing the accused on the 7th of November by giving him five hundred dollars. The defence had afterward assailed the witness' character, and with

the basis furnished by this attack on his character the State offered
the entries to support his veracity. The defence seems to concede
the basis existed for supporting testimony, but contend the entries
offered for that purpose were forbidden by a well settled rule of evi-
dence. Whatever the scope of the rule, permitting proof of similar
statements by the assailed witness, it can not be claimed that under
the guise of supporting testimony illegal evidence can be put before
the jury to affect the accused.

The act under which the defendant is indicted makes the giver as
well as the receiver of the bribe participants in the offence. We
must deal with the witness as in the position the law puts him. It
is settled the jury may convict on the testimony of an accomplice.
Where, however, the State, unwilling to rest on his testimony, seeks
to confirm it, in my view an important rule of evidence, different
from that relied on by the State, is called into operation. In the
argument for the State this is called a rule of practice. However
called, it is founded on experience of this species of testimony and
requires, if such corroboration is attempted, it shall be something
more than testimony as to the acts or conduct of the accomplice to
be supported. The confirmatory proof must relate to the guilt of the
accused. The accomplice has already testified to his own conduct.
To be confirmed, reason would suggest that the corroboration must
refer to the guilt of the accused. Corroboration of the acts of the
accomplice is not in any sense corroboration of the crime of the
party charged. Mr. Greenleaf states there is some disagreement as
to the nature and extent of the corroboration required, some have
deemed it sufficient if the accomplice is confirmed in any material
part of the case; others have required evidence of the *corpus delicti*
only, and yet others who thought it essential there should be cor-
roborating proof that the prisoner participated in the offence, and
when several are tried the confirmation is required as to all; the con-
firmation of the witness, the text adds, is no confirmation at all, as
it respects the prisoner. It is manifest the proof offered here solely
as corroboratory testimony meets no test prescribed by Greenleaf.
He cites approvingly the rule of the Supreme Court of Massachu-
setts, that the confirmatory testimony must relate to a material part
of the case. The decisions of that court have always been of high
repute. The earlier decision was given when its Chief Justice was a
great jurist and the associates stood high in the appreciation of bench

and bar.   The later decision was pronounced by Justice Gray, now of the Supreme Court of the United States.   State vs. Holmes, 127 Mass. Rep. 424.

These decisions carry not only their intrinsic force, but have been adopted as the expositions of the law by Greenleaf, the leading text-book on this branch of the law, as well as by the later writers.   Rice on Evidence.   The Massachusetts case puts the question: what is corroberation, and answers it.   It must relate to the guilt of the accused.   To prove the accomplice has told the truth as to irrelevant and immaterial matters known to everybody would have no tendency to confirm his testimony involving the guilt of the party on trial.   If this were the case every witness could always furnish materials for the corroboration of his own testimony.   If he could state " where he was born," and the decision goes on to enumerate other unimportant points, he might easily get confirmation of all these particulars.   But these circumstances having no necessary connection with the guilt of the accused, proof of the correctness of the statements in respect to them would not conduce to prove the statement of the guilt of the defendant.   There is no substantial difference developed by the authorities on the principle so well stated by the Massachusetts court.   The decision in the first case was years ago, and in the later decision, Justice Gray being the organ, the rule as to the corroborative testimony of an accomplice was affirmed in the strongest language, as laid down in the earlier case.   The adjudications of other courts, notably of Pennsylvania and Georgia, are to the same effect.   In the last case of the Massachusetts court the prisoner, indicted for arson, was convicted on the testimony of an accomplice.   He was confirmed in various particulars of his conduct to which he had testified on the stand.   Thus he had testified that on the night of the crime he had walked around town, gone to a lecture, met with companions, leaving them, had approached the barn, and saw the accused with burning straw in his hands who admitted he had fired the barn; that he then went away, reached his father's home about midnight and went to bed.   The witness further testified that later the accused gave him some bank bills as he had promised.   The accomplice was confirmed by the testimony of others on all the points of his testimony, except as to the material issue, the guilt of the prisoner—that to say, by other testimony he was confirmed in his statements as

to his walk, his visit to the lecture room, the company he met, the time he went to bed and finally that he had been seen with bills in his hands, like those to which he testified. It will be perceived that none of the corroborating testimony touched the guilt of the prisoner. All was admitted over the objection of the defence. The parallel between that and the instant case is obvious. Here, the corroborating testimony relates only to the conduct of the accomplice. It confirms him in these particulars to which he testified, that he gave directions to his book-keeper to enter on the books the amount of the bribe, and the entries were made. The corroboration does not, in the faintest degree, bear on the guilt of the accused. In the Massachusetts case, decided by Justice Gray, the proof was deemed inadmissible as irrelevant and incompetent, the court holding that no evidence can be legally admitted as competent for corroboration of the accomplice that does not confirm the testimony on a point material to the issue in the sense it tends to prove the guilt of the accused. As we appreciate the argument of the State on this point, the reliance is solely on the right of the party calling the witness to support his credit by proof of similar statements on other occasions, and hence the State cites Roscoe, Starkie and a large array of decisions. There is no controversy here as to the right to sustain a witness by proof of similar statements in those cases where the rule applies. Nor is there any contention that a basis for such supporting testimony is afforded by questions on cross-examination, or other modes denoting the purpose to discredit the witness. To this supposed contention much of the argument of the State has been directed. The real issue is, whether any corroborative testimony is competent to sustain an accomplice that does not confirm his testimony as to the guilt of the prisoner. It is the question as to the corroboration required in the case of the accomplice we have to deal with here, and not the other issue to which the argument and authorities of the State have been largely directed—i. e., the general rule that an assailed witness may be supported by proof of his similar statements on other occasions. It is stated in the bills that the entries are offered for corroboration, not of the facts that fix guilt on the accused, but to confirm the witness' narrative as far as possible, and to sustain his veracity. The only tendency of the entries is to show the accomplice told the truth in respect to directing the entries, and

that they were made. To that extent they sustain his veracity and no further. It is conceded they have not the remotest tendency to fix the guilt of the accused. If Justice Gray's exposition of the law is correct, surely the evidence falls within the prohibition he so clearly announces. He was dealing with corroborating testimony as to facts stated by the witness, not pertaining to the guilt of the prisoner. Here the court is dealing wiith corroboratory evidence of facts testified to by the witness but not bearing on the guilt of the accused. Justice Gray held that no such testimony could be admitted to corroborate an accomplice. It was incompetent and irrelevant, in his view, unless it tended to prove the guilt of the accused. It must appear that to hold these entries competent evidence, we must determine that the construction of the law by these two decisions of the highest court of Massachusetts is erroneous; there must also be denied to the text writers the authority accustomed to be paid to them. At an early period our Legislature declared that the forms of proceeding and rules of evidence in criminal cases should be according to the common law. For more than ninety years our courts have been guided by that system, and the judicial expositions of its principles and of its rules of evidence in criminal cases. See act of 1805, now Sec. 976, R. S.; State vs. McCoy, 8 Rob. 545; State vs. Lacombe, 12 An. 195. A rule of evidence in criminal proceedings observed in the common law courts, that testimony offered to support an accomplice is not competent, that confirms only as to facts not touching the guilt of the prisoner, is commended by a force of reason and authority that the legal mind finds difficult to resist.

The sequence of the introduction of improper evidence against the accused is apparent. The testimony offered to corroborate proving nothing in respect to the guilt of the accused, advances in no respect the solution of the issue of guilt. Under the guise of corroboration it serves to put before the jury incompetent evidence to affect the prisoner. That effect was the precise question determined in the Massachusetts cases, thus stated in the clearest language by the learned judge in the last case. Determining that no evidence can be admitted as competent for corroboration that does not tend to prove the guilt of the accused, the result is as he states it, that if any evidence is admitted by way of corroborating the accomplice, so as to make it safe for the jury to convict, which is not legally entitled to that effect, it is a subject of exception and a

State vs. Callahan.

ground for a new trial.    That must be the result here or the rule of law disregarded.

The admission of illegal evidence in a civil case is comparatively unimportant.    The judge disregards the incompetent evidence, and the judgment is based on that which is legal.    But in a criminal case the judge has no such function.    It is for the jury to convict, and is presumed to act on all the evidence submitted.    It is impossible to determine what influence has been exerted on their minds by illegal evidence, and it is the right of the accused to be tried on legal evidence alone.    If that right has been invaded there has not been the fair trial guaranteed to all by the Constitution and laws.    Hence this court is powerless to accept any suggestion, even if it were made, that without the improper evidence there was enough to convict.    To this effect is the uniform current of all authority well epitomized thus:  The admission of illegal evidence can not be disregarded on the ground that the other evidence in the cause was sufficient to convict.    The conviction must be by legal evidence only.    And again thus:  The court can not look into the whole case to determine whether or not there is other testimony sufficient to establish the defendant's guilt.    To do so would be, in effect, to set aside the verdict of the jury, and to form conclusions for ourselves from the evidence.    The defendant is entitled to the verdict of a jury upon competent testimony alone.

The rules of evidence are for all time and for all men.    They tend to secure the conviction and punishment of the guilty.    They have the no less important function of guarding the rights of the innocent who may be accused of crime.    It is bad if the guilty sometimes escape.    It would be worse if criminal trials were conducted without regard to those rules the wisdom of the law has provided for the guidance of courts.

The new trial being inevitable, it is proper to state that, in my opinion, the act of 1890 is applicable to the offence charged.    The accused can be tried again on that indictment, and this opinion simply indicates the illegal evidence to be excluded.

I concur in the decree.

32

DISSENTING OPINION

REGARDING THE INTERRUPTION OF COUNSEL.

BREAUX, J.    The trial court certifies that it had decided that Act No. 78 of 1890 applied if the defendant was guilty of having received a bribe.

The court's statement in the bill of exceptions is sustained by the record.

An indictment against the defendant for the offence charged had been quashed on the ground that the act of 1890 applied. In the case at bar a demurrer on the ground that the defendant was not bound to answer had been filed and overruled.

The court had in these proceedings laid down its interpretation of the act in question.

The opinion of counsel regarding the law differed from the ruling of the court. One of the counsel, addressing the jury, read Art. 168 of the Constitution; and continuing his argument referred to the act of 1890, and stated to the jury that as to the receiver of a bribe, the statute is plain, that the only persons contemplated, were the officers and members of the General Assembly, and counsel was interrupted at this point by the court, and was informed that, if he intended to question the applicability of the statute, he would not be permitted.

We have seen that the court had previously ruled.

If the trial court is subjected to a review of its ruling before the jury, and to an appeal to them for their reversal of the ruling by their verdict, it will be subversive of the respect due to that tribunal.

The jury should have confidence in the ability of the trial judge to properly interpret the law, and the judge should feel confident of the desire of the jury to discharge their duty. That confidence will be shaken if an appeal be allowed from the court to the jury. We have found no decision favorable to such an appeal (either English or American), to which attention has been called.

The case of the Dean of St. Asoph, made illustrious by the address of Erskine, the greatest advocate and forensic orator of his age, is cited by defendant's counsel.

The position of the defence has no support in this case, as will appear by a brief review.

The dean, one of a great many respectable gentlemen, im-

pressed by the danger to the public credit occasioned by long war, and, oppressed by grievous taxes, published a suggestive and guarded dialogue between a farmer and scholar, in which the scholar, meaning to illustrate the great principle of good government, asked the farmer a number of suggestive questions, which the public prosecutor charged were seditious and conceived to excite disloyalty and disaffection.

The dean was brought to trial as one of the principal offenders. In defending him, Erskine argued against the restraint placed on the jury by the court.

The juries, at the time, in all cases of alleged libel and treason, were confined to a finding of the fact of publication as charged.

They were not permitted to determine whether it was or not a libel or sedition.

Erskine contended that it was a question of libel or no libel, sedition or no sedition, and not a question exclusively of publication, and that the jury should exercise jurisdiction over the whole charge. His address paved the way for greater rights to juries in the administration of criminal justice.

He, with great clearness, admits that an accused can not claim before the jury the protection of a deficient indictment. But he claimed that the jury should exercise jurisdiction over the whole charge in finding a verdict.

The Constitution of 1879, of this State, has applied the principle for which he contended by ordaining that the jury shall be the judges of the law and the facts *after the charge*, and not of questions of law arising during the trial and necessarily decided before the case goes to the jury.

A text writer, referred to by defendant's counsel in this case, said that at the time of the foundation of the English colonies in this country there was a very strong feeling against arbitrary power, as the colonies had painful recollections of the abuse of judicial power in the mother country, and therefore it was natural that they should seek to enlarge the power of the jury and diminish that of the judge. Hence the doctrine that the jury could take away the law into their hands without regard to the judge's charge, popular before and at the time of the revolution.

Even if the preponderance of judicial authority was not, in this country, as it is, in favor of the doctrine that the jury should take the law

from the court and apply it to the evidence under its direction, under the doctrine popular before and at the time of the revolution, regarding the rights of juries, an appellate court will find no authority to grant a new trial and remand a case to enable the defence to argue a proposition not founded in law. The avowed purpose of the defendant was to argue a proposition that the trial court had decided illegal, and the ruling is affirmed by this court.

What useful purpose would be served in thus remanding the case as applied for? Surely not to enable the jury to reach a different conclusion in regard to the act of 1890 relative to bribes.

The facts which form the basis of the third and fourth bills of exceptions are:

That to the witness, Widney, the District Attorney propounded questions as to who furnished the amount of the alleged bribe.

The objection was that the evidence was not admissible for the reason that conversations between third persons tending to implicate the defendant, but not had in his presence, is irrelevant.

There were three parties to the agreement regarding the alleged bribe—Widney, Wood and Callahan.

In compliance with the agreement entered into by these parties, in person, the witness testifies he paid the amount. Wood was not a third person to the agreement. He and Widney had interviews with the defendant, and acted concurrently in the matter of securing a privilege from the council through the defendant.

Moreover, the judge certifies that the fact sought to be elicited by the question objected to had gone to the jury when the objection was made in answer to questions previously propounded.

The admissibility of testimony can not be determined if the complaint is first made when the statement of a witness is reiterated. State vs. Holmes, 40 An. 170: State vs. Donelon, 45 An. 755.

### PART OF THE RES GESTÆ.

Question also arose regarding the admissibility of the " stub " to identify the check, cash book and ledger.

With reference to the first, the trial judge certifies that over the objections of counsel for defendant he ruled that the stub of a check drawn to bearer for five hundred dollars, and dated November 7, 1893, with pencil mark " ent. 15 " written across, was admissible as part of the *res gestæ;* to the ruling, counsel for the defendant excepted.

It was a contemporaneous entry with the alleged bribe and part of the transaction. It was immediately incident to the principal act; part of the direct concomitant or conditions of the act. Wharton, Criminal Evidence (9th Ed.), par. 266.

The following is from Thompson on Trials, 466, and has some bearing: "And where an accomplice testifies that he had paid a bribe to the defendant (on trial for bribery) by giving to the defendant a check upon a certain bank, payable to cash or bearer, which had afterward been returned by said bank to the witness, it was competent for the State, in corroboration, to show by the books and business *memoranda* of the bank a credit to the defendant for a like amount; deposited by check two days after the alleged bribery."

### STUB AND ENTRY IN BOOK ARE CLOSELY RELATED.

This evidence being admissible, and the stub admitted being identified on its face with the entries in the books, to which the most serious objections are made, it does not seem that entries thus identified are inadmissible, as they are part of one act; that the law supporting the admissibility of the stub goes far toward justifying the admissibility of the entries in the cash book and ledger. They are intimately connected, and among business men the existence of check and stub suggest proper entry in cash book and ledger.

In the lower court a distinction was made between the check and stub and the entries in the books. The latter, the entries, were finally admitted.

The prosecuting officers state that the entries in the books of the Pennsylvania Coal Company were not offered for the purpose of corroborating the testimony of an accomplice as to those facts which fix the guilt of the accused, but for the purpose of sustaining his veracity.

On the part of the defence it is urged that the evidence was admitted to corroborate an accomplice. The court certifies that the evidence was not admitted for the purpose of corroborating the testimony of an accomplice, as contended by the defendant; that on the cross-examination of the witness, Widney, there was an attack made upon his veracity, and that the defendant had laid the foundation for impeaching his testimony, by propounding questions to that end; that without the testimony the State would have been left in a

crippled condition without an opportunity of repairing the effect of the attack upon the veracity of the witness. That the avowed purpose of the cross-examination of the witness had been to show that his statement, with reference to the alleged bribe, was a fabrication of recent date, and that witness' statement subsequent to the 15th of November (the date of the entries in the books) would establish the fabrication. The principle is well settled that if evidence had been offered to show bias, improper motive or recent fabrication on the part of a witness, previous account given at a time unsuspicious, is admissible on a redirect examination. Best's Principles of Evidence.

In People vs. Vane, 12 Wendell, 79, it was decided that the rule applies to an accomplice: "The witness shows on his direct examination that *he was an accomplice;* his testimony is therefore suspicious; it comes from a tainted source and may well be doubted. In such a case it seems to me the principle applies, that a witness who is impeached may be supported. * * * The rule is laid down by Macauley, that what a witness has been heard to say at another time may be given in evidence either to invalidate or confirm the testimony which he gives in court."

In Commonwealth vs. Scott, 123 Mass. 222-238, referring to Commonwealth vs. Bosworth, 22 Pick. 397, it is said: "In that case (Bosworth), that the evidence in corroboration of the accomplice was admissible." See also State of Kansas vs. Emma Hendricks, 32 Kansas, 559-563.

From Bishop C. P. 1170 we quote: "Not inconsistently with these views it is permissible also to submit to the consideration of the jury evidence tending to show the accomplice's probable credibility, in his narrative, though coming short of the required confirmation."

That rule is approvingly referred to in State vs. Banks *et al.*, 40 An. 739, in deciding a point similar in some respects. The evidence was not admissibile for the purpose of corroborating the testimony of an accomplice.

It was admissible to prove the fact, the entry in the employer's books, in regard to which he was impeached on cross-examination.

At the time the entries were made it was not self-serving, but it was the reverse, self-harming, evidence of an agreement reprobated and denounced by law. The State attempted to sustain his testimony, assailed, by offering book entries to establish that he had

withdrawn the amount from the business in his charge as agent.   The fact had been previously proved by the "stub book," identified with the entries.   The former, the "stub book," was legal evidence it is now decided.

Rapalje, in his treatise on the "Law of Witnesses," p. 252, under the head, "Cross examination of Accomplices," explains that the chapter regarding witnesses applies equally to accomplices, except "that the latitude of cross-examination is especially extended where the witness is an accomplice, in allowing questions having a tendency to shake his credit by injuring his character or to prove his accuracy or veracity; and in such matters much is left to the enlightened discretion of the court trying the cause, and its action will not be reversed; unless such discretion appear to have been abused;" and when this cross-examination "tends to create a distrust of his integrity, fidelity or truth, it was held competent for the adverse party to ask the witness an explanation which might show the consistency of such facts with his integrity, fidelity and truth, although circumstances might thus be proved which were foreign to the principal issue, and which, but for such previous examination, would not have been permitted to be proved."

No one denies that the object of the law of evidence is the discovery of truth under systematic methods.

It should also be conceded, for it is the law, that a witness may be sustained, whether impeached on cross-examination or by examining other witnesses in rebuttal.

This being the rule, let us assume, for illustration, that the amount was $10,000 instead of $500, and that the defence had produced evidence in rebuttal in proof of the utter impossibility of the witness having given that amount for reasons stated by the impeaching witnesses.

Evidence, under the circumstances, is admissible only to sustain the witness in the statement that the employer's cash furnished the amount, as shown by stub, cash book and ledger, if there is not the least ground to suspect that the evidence is untrue; and admissible only to establish that the witness did not state an untruth when he swore that he had the amount.   As to whether he gave it or not as a bribe is another matter.   It does seem that these instruments of evidence are admissible exclusively to prove that that sum was from the business of the employer, although charged as in this case.

State of Kansas vs. Emma Hendricks, 32 Kansas, 559-563; State vs. Maury, 54 Conn., 178-191; State vs. Wolcott, 21 Conn. 272-281.

### THE ALLEGED REFERENCE TO DEFENDANT.

It is error if the court permit counsel, against defendant's objection, in addressing the jury, to comment on the omission of the defendant to testify as a fact for consideration in determining the case.

The facts which form the basis of the bill of exceptions to the court's ruling refusing to treat the whole case as a nullity, because of a remark of the Assistant District Attorney, are that, in addressing the jury, he said: "Who has denied that the defendant has received five hundred dollars? The accused has not denied it. I have not heard him deny it."

To which counsel for the defendant called attention of the court, and instructed the jury that they must disregard the remarks of the Assistant District Attorney.

That prosecuting officer then continued his address to the jury, saying, in substance: "I meant that there was no testimony in the case to prove that Callahan denied accepting or getting the money, and there has been no scintilla of evidence contradicting the statement of Wood and Widney, and that he meant no personal allusion to Callahan."

The jury were also instructed in the general charge that they were not to construe anything unfavorable to the accused by reason of the fact that he had not testified.

If, despite the explanation and withdrawal of the remarks by the District Attorney, there lurked the least presumption in the minds of the jurors, it must have been removed by the instruction of the court.

The allusion and the correction brought out prominently that no inference was to be drawn against the accused from his omission to testify. It was, at most, a hasty utterance immediately corrected by cautioning the jury against giving it the least importance.

"The judge is not required to treat the whole case as a nullity because of such remarks." Com. vs. Worcester, 144 Mass. 58, 57; Wharton, Criminal Ev. (9th Ed.) 435; Rapalje, Law of Witnesses, 252.

### THE INSTRUCTION GIVEN TO THE JURY.

*Lastly*, the defendant requested the trial judge to instruct the jury that, if it was the duty of the accused to favor and vote for the ordinance of the council in question, and if he did favor and vote for it, without partiality and favor, as a matter of law the accused was not guilty. The court gave the charge requested, and added (to which addition the defendant objected) : "But I charge you further, that if he voted for it and favored it by reason of the fact that he was paid for it, he would have acted with partiality or favor, and if you should so find beyond a reasonable doubt, he would be guilty."

The theory of the defence was, if the accused received the amount he was guilty of extortion in office, and not of receiving a bribe.

Requiring an amount for a vote is the crime denounced.

When the statute of 1890 was adopted there were statutes in the books denouncing extortion in office.

Nevertheless, the law-makers created a new offence and provided more severe penalties. It is not within the authority of the courts to restrict or change the legislative intent as expressed in the text. The office is honorary, without emolument of any kind. If he accepted an amount which influenced him to vote with partiality or favor, the offence was within the meaning of the statute.

The Chief Justice concurs in this dissent.

Rehearing refused.